Argued and submitted June 7, accused censured November 19, 1990, reconsideration denied January 3, 1991

In re Complaint as to the Conduct of

# THE HONORABLE EDWARD N. FADELEY,
*Accused.*

## (No. 89-13; SC S37022)

802 P2d 31

Clifford N. Carlsen, Jr., of Miller, Nash, Wiener, Hager & Carlsen, Portland, argued the cause and filed the brief on behalf of the Commission on Judicial Fitness.

Susan G. Bischoff, Salem, argued the cause on behalf of Justice Fadeley. Paul J. De Muniz, of Garrett, Seideman, Hemann, Robertson & De Muniz, P.C., Salem, filed the briefs.

Allen L. Johnson, Eugene, filed a brief on behalf of *amicus curiae* American Civil Liberties Union.

Before Peterson, Chief Justice, Carson, Gillette, Van

Hoomissen, Unis, and Graber, Justices, and Howell, Justice pro tempore.*

PER CURIAM

Unis, J., concurred in part and dissented in part and filed an opinion in which Van Hoomissen, J., joined.

* The Honorable Edward H. Howell, Senior Judge, sitting by designation. *See* ORS 1.300(1) and (2).

## PER CURIAM

This is a case of mandatory review pursuant to ORS 1.430(1) of Findings of Fact, Conclusions of Law and Recommendation of the Commission on Judicial Fitness and Disability (the Commission)[1] recommending that the Accused, the Honorable Edward N. Fadeley, an Associate Justice of this court, be censured for wilful violations of the Code of Judicial Conduct. The Accused admits the violations of the Code of which he is accused, but he argues that, for various statutory and constitutional reasons, he may not be disciplined for the conduct in question. We do not find any of the Accused's statutory or constitutional arguments to be well taken. The Accused is censured.

## FACTS AND PROCEDURAL HISTORY

Personal solicitation of campaign funds by a candidate for judicial office is forbidden by Canons 7B(7) and 7D of the Code of Judicial Conduct, which provide:

"B. A judge may not:

"* * * * *

"(7) personally solicit campaign contributions; but a judge may establish committees to secure and manage financing and expenses to promote the judge's election and to obtain public statements of support for the judge's candidacy;

"* * * * *

---

[1] The Commission is established by ORS 1.410, which provides:

"(1) There is created the Commission on Judicial Fitness and Disability consisting of:

"(a) Three judges appointed by the Supreme Court;

"(b) Three persons appointed by the Board of Governors of the Oregon State Bar from among persons admitted to practice law in this state; and

"(c) Three persons appointed by the Governor who are not qualified under either paragraph (a) or (b) of this subsection.

"(2) The term of a member is four years, but whenever a member ceases to meet the qualifications under which the member was appointed, membership shall end. Before the expiration of the term of a member, a successor shall be appointed to perform the functions of a member on the day next following expiration of the term of the member. In case of a vacancy for any cause, the appointing authority shall make an appointment to become immediately effective for a four-year term.

"(3) Appointments by the Governor are subject to confirmation by the Senate in the manner provided in ORS 171.562 and 171.565."

"D. The provisions of this canon apply to each judge in the state at all times and to any other person who becomes a candidate for an elective judicial office. A person becomes a candidate for an elective judicial office when the person announces the candidacy or when steps are taken, with the person's approval, to place his or her name on an election ballot."

On May 12, 1989, the Commission notified the Accused that it had received a complaint that the Accused had personally solicited campaign contributions in connection with his 1988 campaign for the position that he now holds. An investigation followed, during which the Accused fully disclosed to the Commission those of his activities during his campaign for election to this court that clearly or even arguably fell within the prohibitions of Canons 7B(7) and 7D.

On September 1, 1989, the Commission served the Accused with a complaint, alleging that the Accused had violated Canons 7B(7) and 7D by personally soliciting campaign funds. The Commission held hearing on February 16, 1990, at which the Accused and counsel for the Commission stipulated as to these facts:

"1. [The Accused] was elected to the Supreme Court of Oregon in the November, 1988 general election, and has served as an associate justice on that court continuously since January 2, 1989.

"2. On or about December 2, 1988, the Oregon Labor Press published, as a letter-to-the editor, a letter signed by [the Accused, who was then an associate justice-elect of this court] soliciting contributions to defray expenses of his campaign committee incurred in the campaign for election to the court.

"3. In June, 1988, at a campaign organizer meeting, [the Accused] participated in a request for pledges to his campaign committee.

"4. Personal solicitation of campaign contributions to his committee occasionally resulted from [the Accused's] asking business representatives to serve on his campaign finance committee, during 1988.

"5. [The Accused] personally solicited campaign finance pledges from some members of the Oregon State Bar, during 1988."

On March 27, 1990, the Commission entered its Findings of Fact, Conclusions of Law and Recommendation. The Commission found the facts stipulated by the Accused. It concluded that the acts in question violated Canons 7B(7) and 7D of the Code of Judicial Conduct. It unanimously recommended that the Accused be censured "in the strongest terms" by this court. The matter is now before us for final action. ORS 1.420 and 1.430.[2]

The Accused does not dispute the Commission's Findings of Fact. Neither does he dispute that those findings demonstrate that he has violated both Canons 7B(7) and 7D of the Code of Judicial Conduct. Instead, the Accused confines his arguments in this court to legal assertions that (1) the Commission had no jurisdiction over the Accused, the acts in question, or both, and (2) if the Commission did have jurisdiction, then sanctioning the Accused for the acts in question would violate his free speech rights under Article I, section 8, of the Oregon Constitution and the First and Fourteenth Amendments to the United States Constitution. The American Civil Liberties Union of Oregon (ACLU), *amicus curiae,* argues separately that, under the Oregon Constitution, regulation of elections is a matter entrusted to the legislature, not this court, and Canon 7B(7) impermissibly encroaches on the

---

[2] ORS 1.420 provides, in part:

"(1) Upon complaint from any person concerning the conduct of a judge or upon request of the Supreme Court, and after such investigation as the Commission on Judicial Fitness and Disability considers necessary, the commission may:

"(a) Hold a hearing pursuant to subsection (3) of this section to inquire into the conduct of the judge; * * *

"* * * * *

"(3) When a hearing is held by the commission * * * as authorized in subsection (1) of this section, the hearing shall be public and all the testimony and evidence given and received in the hearing shall be public records. The judge shall have the right to be present at such hearing, to be represented by counsel, to present testimony and evidence and to cross-examine witnesses.

"(4) If, after hearing * * *, the commission finds that the conduct of the judge justifies censure, suspension or removal from office, the commission shall recommend to the Supreme Court the censure or suspension or removal of the judge."

ORS 1.430 provides, in part:

"(1) The Supreme Court shall review the record of the proceedings under ORS 1.420 on the law and facts and may receive additional evidence. The Supreme Court may censure the judge or it may order the judge suspended or removed from office."

legislature's authority. We shall consider each of these contentions in turn. Before doing so, however, a brief historical discussion is in order.

## THE COURT, THE COMMISSION,
## AND THE CODE

Until 1967, there was no provision in the Oregon Constitution specifically governing removal of judges from office by this court.[3] In that year, the legislature referred to the people an amendment to the judicial article, Article VII (Amended) of the Oregon Constitution, adding a new section 8:

"Section 8. (1) In the manner provided by law, and notwithstanding section 1 of this Article, a judge of any court may be removed from his judicial office by the Supreme Court for:

"(a) Conviction in a court of this or any other state, or of the United States, of a crime punishable as a felony or a crime involving moral turpitude; or

"(b) Wilful misconduct in a judicial office involving moral turpitude; or

"(c) Wilful or persistent failure to perform judicial duties; or

"(d) Habitual drunkenness or illegal use of narcotic drugs."

Or Laws 1967, Senate Joint Resolution (SJR) 9. The amendment was adopted at the November 5, 1968, general election.

Contingent on passage of SJR 9, the 1967 legislature also passed the act creating the Judicial Fitness Commission. Or Laws 1967 ch 294. Section 6 of that 1967 Act[4] became ORS 1.420. The section has since been amended to expand the range of sanctions that the Commission can recommend (Or Laws 1971 ch 511, § 3) and to add the phrase "and Disability" to the official name of the Commission (Or Laws 1987 ch 520, § 5), but its basic thrust has remained the same. Thus, since the adoption of Article VII (Amended), section 8, of the

---

[3] The only methods for removal of a judge prior to 1967 were found in Article II, § 18 (recall) and Art VII (Amend), § 6 (removal after trial for incompetency, corruption, malfeasance or delinquency in office).

[4] Mislabeled as "section 7" in the legislative history source note to the statute in the printed volumes of the Oregon Revised Statutes.

Oregon Constitution, there has been in place a mechanism for disciplining judges through a judicial fitness commission and this court. *See In re Piper,* 271 Or 726, 730-33, 534 P2d 159 (1975) (discussing history of the statute).

Neither the 1967 constitutional amendment nor its statutory implementation mentioned the Code of Judicial Conduct. The Code was not adopted by this Court until March 11, 1975. Before that time, judicial conduct was governed by the earlier Canons of Judicial Ethics, adopted by this court in 1952. *In re Piper, supra,* 271 Or at 736 n 12. Canon 7B(2) of the 1975 Code contained essentially the same provision embodied today in Canon 7B(7), but in the form of a recommendation. *Former* Canon 7B(2) provided, in part:

> "A candidate, including an incumbent judge, for a judicial office that is filled by public election between competing candidates should not himself solicit campaign funds; he may establish committees of responsible persons to secure and manage the expenditures of funds for his campaign and to obtain public statements of support for his candidacy. Such committees are not prohibited from soliciting campaign contributions and public support from lawyers. A candidate's committees may solicit funds for his campaign."

Roughly a month after the adoption by this court of the 1975 Code of Judicial Conduct, a resolution was introduced in the legislature, seeking to refer to the people an amendment to Article VII (Amended), section 8, that would permit this court to remove, suspend or censure judges for "[w]ilful violation of any rule of judicial conduct as shall be established by the Supreme Court." Or Laws 1975, Senate Joint Resolution 48. The voters approved the referred constitutional amendment on November 4, 1975, thereby creating what is now Oregon Constitution, Article VII (Amended), section 8(1)(e):

> "(1) In the manner provided by law, and notwithstanding section 1 of this Article, a judge of any court may be removed or suspended from his judicial office by the Supreme Court, or censured by the Supreme Court, for:
>
> "* * * * *
>
> "(e) Wilful violation of any rule of judicial conduct as shall be established by the Supreme Court[.]"

Oregon Constitution, Article VII (Amended), section 8, thus assumed the form that it has retained to this day.

Most recently, on December 1, 1983, this court promulgated a revised Code of Judicial Conduct, this time couched in mandatory terms.[5] It contains the present form of Canons 7B(7) and 7D. With the foregoing history in mind, we turn to the arguments made by the Accused.

## JURISDICTIONAL CONSIDERATIONS

■ The Accused first asks this court to hold that the Commission had no jurisdiction to inquire into his failure to abide by the Code of Judicial Conduct, because ORS 1.420 does not mention the Code in its description of the Commission's role.[6] The Accused reasons this way: At the same time the people originally granted this court authority to remove judges by the 1967 constitutional amendment, the Judicial Fitness Commission statute became operative and gave the Commission jurisdiction to inquire into any "complaint from any person concerning the conduct of a judge." At that time, because there was no Code of Judicial Conduct in existence in Oregon, no complaint concerning a violation of the Code could have been made to or considered by the Commission. Later, in 1975, when this court adopted the former version of the Code and the people, by their enactment of Oregon Constitution, Article VII (Amended), section 8(1)(e), authorized this court to remove, suspend or censure a judge for "[w]ilful violation of any rule of judicial conduct as shall be established by the Supreme Court," ORS 1.420 was not amended to specify that

---

[5] The form of the language, whether hortatory (the 1975 version of the Code) or mandatory (the 1983 version of the Code), has not been treated as dispositive. *See In re Piper,* 271 Or 726, 534 P2d 159 (1975) (1975 Code provision treated as mandatory).

[6] The Accused acknowledges that, whatever ORS 1.420 may provide, this court now has jurisdiction over him pursuant to the specific provisions of Or Const Art VII (Amended), § 8. Thus, the Accused suggests, any inquiry into the Commission's statutory powers at this point may be irrelevant or abstract. We think that the Accused retreats too soon. If, as he argues, the Commission had no authority to investigate the complaint against him in the first instance, that lack of authority at least colors the way this court acquired its own authority over the Accused for the purpose of this disciplinary proceeding, because this proceeding purports to be based on the record made before the Commission. In constitutional terms, the argument is that disciplining the Accused for acts over which the Commission had no authority would not be disciplining him "[i]n the manner provided by law."

violations of the Code came within the purview of the Commission. It follows, the Accused argues, that the Commission has no jurisdiction to consider such complaints.

That argument is ingenious, but unacceptably hypertechnical. A wilful violation of the Code of Judicial Conduct is as much "the conduct of a judge," as that phrase is used in ORS 1.420, as would be any of the other forms of conduct reviewable by the Commission before 1975. Moreover, this court has never held that, before 1975, a judge's violation of the Canons of Judicial Ethics (adopted by this Court in 1952) would have been irrelevant to an inquiry by the Commission "concerning the conduct of a judge." If anything, we have implied the contrary. *See In re Piper, supra,* 271 Or at 736 n 12 (discussing prior Canon 30 of the Canons of Judicial Ethics, but indicating that it had been "superseded by Canon 5F of the new [1975] Code"). Any legislative expansion of the jurisdictional statement of the Commission in ORS 1.420 to include "violations of the code of professional conduct" therefore would have been surplusage; the Commission had that jurisdiction at least from the day the Code itself became binding on judges. This argument is not well taken.

■ The Accused also argues that, because all of the acts of which he was accused occurred while he was a candidate for a judgeship or when he was a judge-elect, and none occurred after he assumed his judicial duties, the Commission lacks jurisdiction over him. Again, we disagree.

■ It is clear, in the first instance, that "judge" includes a candidate for a judicial position under the Code of Judicial Conduct. Canon 7D specifically provides:

"The provisions of this canon apply to each judge in the state at all times *and to any other person who becomes a candidate for an elective judicial office.*"

(Emphasis supplied.) It is equally clear that to apply the limitations of Canon 7B(7) to sitting judges, while allowing their as-yet-unelected opponents to campaign unfettered by Canon 7B(7), would create an advantage for the challenger. The legislature did not intend the Commission to have so little and so ineffective jurisdiction over judicial activity. For the foregoing reasons, we conclude that the Commission's authority to

inquire into a complaint "concerning the conduct of a judge" encompasses the acts of the Accused in this case.

Finally, the Accused argues that

> "the proceeding before the court is an election complaint. The Commission's lack of statutory authorization is especially troubling when it seeks jurisdiction over constitutionally mandated elections. Canon 7B(7)'s prohibition on personal solicitation seems in conflict with election statutes placing responsibility for election conduct upon the candidate and requiring the candidate to personally authorize publications. ORS 260.522 and 260.532(2)."

The statutes cited by the Accused[7] deal with the personal responsibility of candidates for public office concerning published campaign matter.

---

[7] ORS 260.522 provides:

"(1) Except as provided in this section, no person shall cause to be printed, posted, broadcast, mailed, circulated or otherwise published, any written matter, photograph or broadcast relating to any election or to any candidate or measure at any election, unless it states the name and address of the person responsible for the publication, including a statement that the publication was authorized by the person.

"(2) A radio broadcast which complies with the requirements of the Federal Communications Act and regulations under it is not required to state the address of the person responsible for the broadcast if the person responsible for the broadcast is a candidate or political committee.

"(3) The prohibition under subsection (1) of this section does not apply to:

"(a) Any sign relating to a candidate if the candidate or the principal campaign committee of the candidate is responsible for the sign and the sign displays the name of the candidate; or

"(b) Any written matter relating to a measure at any election prepared under the direction of the governing body of the city, county or district that referred the measure if the written matter is impartial, neither supports nor opposes passage of the measure and contains the name and address of the city, county or district.

"(4) Any written matter or broadcast which has been previously published shall have the publisher and date of publication clearly identified when it is referred to in a publication listed under subsection (1) of this section.

"(5) 'Address' for purposes of this section means the address of a residence, office, headquarters or similar location where the person may be conveniently located. If the person is a political committee, the address shall be the address of the political committee included in the statement of organization under ORS 260.042."

ORS 260.532(2) provides:

"A candidate who knows of and consents to a publication or advertisement prohibited by this section with knowledge or with reckless disregard that it contains a false statement of material fact, violates this section regardless of whether the candidate has participated directly in the publication or advertisement."

There is no necessary inconsistency between the Commission's proceedings and the statutes in question, or with the election laws in general. Nothing in Oregon Constitution, Article VII (Amended), section 8, or in ORS 1.420, purports to limit the jurisdiction of this court or the Commission to inquire into wrongful conduct, even when that same conduct also is or might be punishable in some other forum on the basis of other laws.

■ *Amicus curiae* ACLU puts a different spin on this aspect of our inquiry by arguing that, to the extent that the proceedings of the Commission and this court constitute the regulation of elections, such proceedings violate Oregon Constitution, Article IV, section 1 ("The legislative power of the state * * * is vested in a Legislative Assembly * * *.") and Oregon Constitution, Article III, section 1 (Separation of Powers).[8] When these two constitutional provisions are read in conjunction with Oregon Constitution, Article II, section 8 ("The Legislative Assembly shall enact laws to support the privilege of free suffrage, prescribing the manner of regulating, and conducting elections, and prohibiting under adequate penalties, all undue influence therein, from power, bribery, tumult, and other improper conduct."), ACLU argues, it is clear that the constitution leaves to the legislature alone the power to regulate elections and to provide penalties for violations of election rules.

We are not persuaded. We find nothing in the foregoing constitutional sections that establishes that the judicial branch may not itself regulate election activities of its members and potential members. We also think that, to the extent that such matters are deemed to have been originally within the purview of the legislative branch alone, or of the people, the adoption by the people of Oregon Constitution, Article VII (Amended), section 8, and the enactment by the legislature of ORS 1.420 may be seen as a limited relinquishment of a portion of their power over such matters by the people and the legislative branch to the judicial branch.

---

[8] Article III, section 1, of the Oregon Constitution, provides:

"The powers of the Government shall be divided into three seperate [sic] departments, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."

■ We hold that the Commission had jurisdiction to proceed against the Accused concerning the acts with which he is charged. We hold that we, likewise, have jurisdiction to discipline the Accused for those acts, to the extent they constitute wilful violations of the Canons of Judicial Ethics. We proceed to examine the constitutional arguments of the Accused and *amicus*.

## OREGON CONSTITUTION, ARTICLE I, SECTION 8

■ Article I, section 8, of the Oregon Constitution proscribes any law "restricting the right to speak, write, or print freely on any subject whatever."[9] This court has repeatedly held that the provision means what it says: although certain harmful *effects* of speech may be forbidden, restrictions aimed not at the harm but at the content of the speech itself normally are impermissible. *See, e.g., Oregon State Police Assn. v. State of Oregon,* 308 Or 531, 783 P2d 7 (1989), *cert den* ___ US ___ (1990); *State v. Robertson,* 293 Or 402, 649 P2d 569 (1982). It is also undeniable that the restriction in Canon 7B(7) against a judicial candidate personally soliciting campaign funds is a restriction on speech aimed at least in part at the content of the speech. From this, the Accused reasons in syllogistic fashion that Canon 7B(7) is unconstitutional under Article I, section 8.

Not even Article I, section 8, is absolute — there are exceptions to its sweep. Among the exceptions are certain rules of professional conduct, *see, e.g., In re Lasswell,* 296 Or 121, 673 P2d 855 (1983) (prosecutor may validly be restricted in what he says during the pendency of a criminal prosecution), as well as certain historical exceptions, *see, e.g., State v. Robertson, supra,* 293 Or at 412 (stating rule). It may be possible to fit the proscription on direct campaign fund solicitation in Canon 7B(7) into an historical exception or, as we discuss *post,* a rule of professional conduct. We think, however, that we may reach one answer to the problem before us in a more straightforward way.

---

[9] Article I, section 8, of the Oregon Constitution, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

As we have previously noted, the 1976 amendment to Oregon Constitution, Article VII (Amended), section 8, contained a specific reference to the right of this court to discipline judges for "[w]ilful violation of any rule of judicial conduct as shall be established by [this court]." Moreover, there already existed, at the time when that amendment to the constitution was submitted to the people, *former* Canon 7B(2), which contained the same restriction on personal solicitation of campaign funds that is under consideration here. This was, therefore, a situation in which the phrase "rule of judicial conduct" had a specific meaning that any voter could have looked up, if he or she wished to do so. In referring to "any rule of judicial conduct," the proposed constitutional amendment was referring to rules that at the time did, and in the future might, restrict to some degree the ability of judges to speak freely. The amendment was adopted by the people.

Because the amendment was adopted, there are two potentially conflicting provisions in the constitution — Article I, section 8, and Article VII (Amended), section 8. It is our function to harmonize the two.

■ We have no difficulty in holding that, in this context, it is Article I, section 8, that is modified. When the people, in the face of a pre-existing right to speak, write, or print freely on any subject whatever, adopt a constitutional amendment that by its fair import modifies that pre-existing right, the later amendment must be given its due. *See Hoag v. Washington-Oregon Corp.,* 75 Or 588, 612, 144 Pac 574, 147 Pac 756 (1915) ("It is a familiar rule of construction that, where two provisions of a written [c]onstitution are repugnant to each other, that which is last in order of time and in local position is to be preferred * * *."). To hold otherwise would be to deny to later-enacted provisions of the constitution equal dignity as portions of the same fundamental document. We hold that Canon 7B(7) does not offend Oregon Constitution, Article I, section 8, because rules such as Canon 7B(7) were contemplated as a consequence of the adoption by the people of Oregon Constitution, Article VII (Amended), section 8. *See In re Piper, supra,* 271 Or at 735 (pointing out that later-enacted Oregon Constitution, Article VII (Amended), section 8, modified pre-existing directive in section 1 of the same Article to the effect that compensation for judges "shall not be diminished during the term for which they are elected"); *see also In*

*the Matter of Sawyer,* 286 Or 369, 387, 594 P2d 805 (1979) (Linde, J., dissenting) ("Article VII (amended), section 8(1)(e), *supra,* in effect has given this court farreaching power to legislate for other judges in the form of rules of judicial conduct, enforceable by potential removal from office by the judgment of the same body that made the rule. That is a power to be used only with scrupulous care in stating the rules and attention to their literal implications." (Footnote omitted.)).

■ Even if the adoption by the people of subsection (e) to Article VII (Amended), section 8, of the Oregon Constitution were not a qualification on the rights guaranteed by Article I, section 8, of the Oregon Constitution, traditional analysis under Article I, section 8, would yield the same result in this case. The right to speak, write, or print freely on any subject whatever, is not absolute. It may be curtailed, for example, in the regulation of certain professions. The case of *In re Lasswell, supra,* is illustrative.

Lasswell was the District Attorney of Douglas County. His office was prosecuting approximately 50 persons for involvement in large-scale drug activity. Lasswell commented in both a newspaper interview and a television program on facts relating to the then-pending cases. The Oregon State Bar charged him with violating DR 7-107, which forbids extrajudicial comment by either prosecution or defense on a range of topics related to the merits of the underlying prosecution. Lasswell defended on the ground that his statements were protected by Article I, section 8.

Because this court's approach to the *Lasswell* case is so pertinent to the analysis here, we set out that approach at some length:

"Unquestionably any rule that in terms directs persons not to make particular kinds of statements is difficult to square with constitutional guarantees of freedom of expression, particularly those of the Oregon Constitution. * * *

"* * * [The] guarantee [of Article I, section 8] forecloses the enactment of prohibitory laws, at least in the form of outright prohibitions backed by punitive sanctions, that in terms forbid speech or writing 'on any subject whatever,' unless it can be shown that the prohibition falls within an

original or modern version of a historically established exception that was not meant to be ended by the liberating principles and purposes for which the constitutional guarantees of free expression were adopted. * * * [This court's] decisions would preclude enactment of the text of [the particular disciplinary rule at issue] as an outright prohibition against disclosure or discussion by persons generally or against publication by those to whom the disclosure or comments were made.

"But that does not decide the present issue. [The disciplinary rule] is not a general prohibition against anyone who might disclose or discuss facts bearing on a pending criminal prosecution. The parts of [the rule] involved here are addressed specifically to '[a] lawyer * * * associated with the prosecution of a criminal matter.' And the potential sanction, though of course serious to a lawyer, is not punitive but professional. It is civil, not penal. * * *

"* * * [T]he rule addresses the incompatibility between a prosecutor's official function, including his responsibility to preserve the conditions for a fair trial, and speech that, though privileged against other than professional sanctions, vitiates the proper performance of that function under the circumstances of the specific case. In short, a lawyer is not denied freedom to speak, write, or publish; but when one exercises official responsibility for conducting a prosecution according to constitutional standards, one also undertakes the professional responsibility to protect those standards in what he or she says or writes. * * *

"* * * * *

"The disciplinary rule deals with purposes and prospective effects, not with completed harm. It addresses the prosecutor's professional responsibility at the time he or she chooses what to speak or write. At that time it is incompatible with his or her professional performance in a concrete case to make extrajudicial statements on the matters covered by the rule * * * when a lawyer knows or is bound to know that the statements pose a serious and imminent threat to the process and acts with indifference to that effect. * * * [T]he question is not whether the tribunal believes that the lawyer's comments impaired the fairness of an actual trial, which may or may not have taken place. The question, rather, is the lawyer's intent or knowledge and indifference when making published statements that were highly likely to have this effect."

*In re Lasswell, supra,* 296 Or at 124-26 (citations omitted).

The analogy between *Lasswell* and the present case is obvious: Each case involves the regulation of speech of a public servant; each involves an allegation of violation of a code of professional conduct; and each involves a claim of conflict between the code of professional conduct and the protection of Article I, section 8. However, the Accused argues that there are at least three distinctions between *Lasswell* and the present case that make the reasoning and the result in *Lasswell* inapposite.

The Accused first argues that in order for a restriction on the speech of a public servant like himself to be valid under Article I, section 8, the speech in question must be "incompatibl[e]" with the public servant's "official function." *In re Lasswell, supra,* 296 Or at 125. That is true, but it does not establish how this case is different.

In *Lasswell,* the incompatibility was between the rights of a District Attorney to speak freely and the right of a criminally accused to a fair trial. Some balancing of those competing rights was required. The disciplinary rule in that case was constitutional because of the relatively minimal burden it placed on the District Attorney's ability to speak. *Id.* at 125. The same rationale justifies Canon 7B(7).

The stake of the public in a judiciary that is both honest in fact and honest in appearance is profound. A democratic society that, like ours, leaves many of its final decisions, both constitutional and otherwise, to its judiciary is totally dependent on the scrupulous integrity of that judiciary. A judge's direct request for campaign contributions offers a *quid pro quo* or, at least, can be perceived by the public to do so. Insulating the judge from such direct solicitation eliminates the appearance (at least) of impropriety and, to that extent, preserves the judiciary's reputation for integrity. On the other side of the ledger, the candidate is not seriously impaired either in the ability to solicit and receive funds — a committee is permitted to do that — or in the ability otherwise to communicate the candidate's position on any issues the candidate is entitled to address — something the candidate himself or herself may do, as long as the message does not include a request for funds.

The Accused next argues that the *Lasswell* rationale

should not apply in any case in which the interest in opposition to that protected by Article I, section 8, is not constitutional in magnitude. We see no justification for so confining *Lasswell;* it is clear that no language from that case itself requires such a limitation. Rather, the issue ought to be whether the offsetting societal interest — whether derived from the constitution of from some other source — is of fundamental importance to a degree akin to the concerns expressed in the constitution. For the reasons already stated, we hold that the interest in judicial integrity and the appearance of judicial integrity is an offsetting societal interest of that kind.

It also may be said that, at least with respect to the limitation placed on judges by Canon 7B(7), the competing interest *is* of constitutional magnitude. When a judge directly solicits funds, the request puts pressure on the person solicited, especially when (as is often the case) the person solicited is a lawyer. The lawyer has an absolute constitutional right to support whom he or she pleases, both with money and with a vote.

The Accused also argues that, to the extent that the *Lasswell* rationale depends on the phrase in Article I, section 8, that "every person shall be responsible for the abuse of this right [of free speech]," the device of defining a kind of speech as an "abuse" is a dangerous approach which threatens the general freedom conferred by Article I, section 8. Our analysis here does not depend on that rationale.

We hold that enforcement by this Court of Canon 7B(7) of the Code of Judicial Conduct, pursuant to the authorization of Article VII (Amended), section 8(e), of the Oregon Constitution, does not impair the Accused's right to free expression under the Oregon Constitution.[10]

## FIRST AMENDMENT

 The Accused argues that, even if the restrictions on speech embodied in Canon 7B(7) do not offend the Oregon Constitution, they do impermissibly interfere with political speech protected by the First Amendment to the United

---

[10] The dissent reads *Lasswell* more narrowly, but we disagree with that reading. We note that the dissent bolsters its reading primarily with quotations from separate, later opinions authored by a single justice of this court. None of those later cases, however, involved civil enforcement of a rule of professional conduct.

States Constitution,[11] which is made applicable to the states through the Due Process Clause of the Fourteenth Amendment.

The parties agree, and we assume, that seeking donations to support a campaign for elective office (including judicial office) is a form of speech and, more particularly, a form of political expression under the First Amendment. Political expression is at the heart of the values expressed in the First Amendment. *Buckley v. Valeo,* 424 US 1, 25, 96 S Ct 612, 46 L Ed 2d 659 (1976). However, even in this most sensitive area of public discourse, not every law and regulation limiting speech is unconstitutional. Relatively significant limitations on protected First Amendment rights "may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* at 25.

As we have elsewhere explained, the interest that Canon 7B(7) (made applicable to the Accused through Canon 7D) protects is the state's interest in maintaining, not only the integrity of the judiciary, but also the appearance of that integrity. The persons most actively interested in judicial races, and the persons who are the most consistent contributors to judicial campaigns, are lawyers and potential litigants. The impression created when a lawyer or potential litigant, who may from time to time come before a particular judge, contributes to the campaign of that judge is always unfortunate. Although many or most lawyers may act with pure motives, *viz.,* to ensure a qualified judiciary and to ensure vigorous public debate, the outside observer cannot but think that the lawyer or potential litigant either expects to get special treatment from the judge or, at the least, hopes to get such treatment. It follows that, if it is at all possible to do so, the spectacle of lawyers or potential litigants directly handing over money to judicial candidates should be avoided if the public is to have faith in the impartiality of its judiciary.

So long as judges are chosen by the electoral process, it will be impossible to deny lawyers and potential litigants the

---

[11] The First Amendment to the United States Constitution provides, in part:

"Congress shall make no law * * * abridging the freedom of speech * * * or the right of the people peaceably to assemble * * *."

right to give to campaigns or to deny judges the right to seek contributions. Both activities are too important in the scheme of things to permit either to be forbidden outright. *See First National Bank of Boston v. Belotti,* 435 US 765, 98 S Ct 1407, 55 L Ed 2d 707 (1978) (Massachusetts statute forbidding certain national banking corporations and business corporations from making expenditures in an attempt to influence the outcome of votes on referendum proposals held unconstitutional abridgment of First Amendment rights). Some other, less intrusive method is needed.

Canon 7B(7) is that method. It permits the judge to obtain funds to carry out a campaign but eliminates the specter of contributions going from the hand of the contributor to the hand of the judge. The limitation on the ability to raise funds need not cause the campaign to suffer, if the judge picks good people for his or her campaign finance committee. It is true that the committee, however well suited to the task, may have trouble obtaining as much as the judge might have raised by personal buttonholing, but that is the point.

The decision of the United States Supreme Court that we find most helpful in this area is *Ohralik v. Ohio State Bar Assn.,* 436 US 447, 98 S Ct 1912, 56 L Ed 2d 444 (1978). The case involved the constitutionality, under the First and Fourteenth Amendments, of an Ohio State Bar Association rule forbidding in-person solicitation of clients by attorneys for pecuniary gain.[12] Ohralik, the lawyer, had solicited two women to use him as their attorney in an attempt to obtain benefits under the uninsured motorist clause of an insurance policy. Each of the young women eventually discharged Ohralik, who thereafter sued each to obtain one-third of their later settlements with the insurance company.

Both women complained to Ohralik's county bar association, which censured him. The case was then reviewed

---

[12] The dissent criticizes this court for using a "commercial speech" case as authority for dealing with the present "political speech" problem. If *Ohralik* were all that we relied upon, the criticism might be well taken. But *Ohralik* specifically provides the analytical bridge between *Bates v. State Bar of Arizona,* 433 US 350, 97 S Ct 2691, 53 L Ed 2d 810 (1977), and *In re Primus,* 436 US 412, 98 S Ct 1983, 56 L Ed 2d 417 (1978), both discussed *post. Primus* is the principal case on which the accused relies, it is a *political* speech case, and it was decided on the same day as *Ohralik.* The dissent's failure to see the analytical relationship between *Ohralik* and *Primus* is one of the primary errors in the dissent's approach to the entire First Amendment discussion.

by the Ohio Supreme Court, which increased the sanction to an indefinite suspension. The United States Supreme Court granted review in the case to address Ohralik's claim that his solicitation of the two women's legal business was speech protected by the First and Fourteenth Amendments. That Court held that the disciplinary action against Ohralik did not violate the constitutional protections upon which he relied.

The Court had previously held that advertising concerning the availability and terms of routine legal services was protected commercial speech. *Bates v. State Bar of Arizona,* 433 US 350, 97 S Ct 2691, 53 L Ed 2d 810 (1977). Ohralik relied on *Bates.* The Court found *Bates* inapposite. Although it was true, the Court acknowledged, that commercial solicitation was entitled to a limited degree of protection, it was clear that many forms of such speech could be limited by laws regulating the sale of securities, the exchange of price and production information among competitors, and the like. *Ohralik v. Ohio State Bar Assn., supra,* 436 US at 456. The Court more specifically distinguished *Bates* this way:

> "[I]n-person solicitation serves much the same function as the advertisement at issue in *Bates.* But there are significant differences as well. Unlike a public advertisement, which simply provides information and leaves the recipient free to act upon it or not, in-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection. The aim and effect of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decision-making; there is no opportunity for intervention or counter-education by agencies of the Bar, supervisory authorities, or persons close to the solicited individual."

*Ohralik v. Ohio State Bar Assn., supra,* 436 US at 457 (footnote omitted).

On the other hand, the Court noted,

> "The state interests implicated in this case are particularly strong. In addition to its general interest in protecting consumers and regulating commercial transactions, the State bears a special responsibility for maintaining standards among members of the licensed professions. * * *
>
> "* * * * *
>
> "* * * The Rules prohibiting solicitation are prophylactic

measures whose objective is the prevention of harm before it occurs. The Rules were applied in this case to discipline a lawyer for soliciting employment for pecuniary gain under circumstances likely to result in the adverse consequences the State seeks to avert. In such a situation, which is inherently conducive to overreaching and other forms of misconduct, the State has a strong interest in adopting and enforcing rules of conduct designed to protect the public from harmful solicitation by lawyers whom it has licensed."

*Id.* 436 US at 460, 464 (citations omitted). A prophylactic rule under such circumstances did not violate the Constitution. *Id.* at 466.

Although the Court in *Ohralik* was at pains to point out that it was dealing with commercial, not political, speech, 436 US at 458, we think that the underlying point is equally applicable here. There is, in the context of in-person solicitation of campaign funds, a certainty of an appearance of impropriety and a high degree of likelihood of overreaching or undue influence by the requesting judge. The state has a fundamental interest in avoiding those consequences, an interest that it has vindicated by promulgating Canon 7B(7). Moreover, that Canon asserts the state's interest in the narrowest, least intrusive way possible consistent with the legitimate purpose of the rule. We think that *Ohralik* supports the result that we reach in this case.

The Accused relies principally on *In re Primus,* 436 US 412, 98 S Ct 1893, 56 L Ed 2d 417 (1978), decided the same day as *Ohralik.* In that case, Primus, a lawyer, was publicly reprimanded by the South Carolina Supreme Court for soliciting a client in violation of South Carolina's bar disciplinary rules. Primus, who was a cooperating lawyer with the ACLU, had contacted a woman who had been forced to accept sterilization in order to keep her eligibility for welfare payments and informed the woman that the ACLU was prepared to pay for her legal representation if the woman wished to sue the parties responsible for her sterilization. Primus sought review of her disciplinary case in the United States Supreme Court, claiming her First Amendment rights of free speech and association had been infringed by the action of the South Carolina Supreme Court.

The United States Supreme Court accepted review of

Primus' case and reversed the disciplinary action. The Court first recognized that states enjoy broad powers in the regulation of professions, extending even to the power to forbid, in certain instances, "in-person solicitation by lawyers who [are seeking] to communicate purely commercial offers of legal assistance to lay persons." *In re Primus, supra,* 436 US at 422 (citing *Ohralik v. Ohio State Bar Assn., supra*). Primus' case differed from *Ohralik,* the Court said:

> "This was not in-person solicitation for pecuniary gain. Appellant was communicating an offer of free assistance by attorneys associated with the ACLU, not an offer predicated on entitlement to a share of any monetary recovery. And her actions were undertaken to express personal political beliefs and to advance the civil-liberties objectives of the ACLU, rather than to derive financial gain."

436 US at 422.

That distinction from *Ohralik* made all the difference, so far as Primus' First Amendment rights were concerned. The Court had long held that collective activity aimed at obtaining meaningful access to the courts was a fundamental First Amendment right. *See, e.g., NAACP v. Button,* 371 US 415, 83 S Ct 328, 9 L Ed 2d 405 (1963). Like the NAACP in the *Button* case, the ACLU in *Primus* was engaged in offering legal services not primarily for its own profit, but to further civil libertarian goals that the ACLU had long espoused. Therefore, the Court held, South Carolina's action in punishing Primus for soliciting a client for political purposes could stand only if it survived the "exacting scrutiny" applicable to such limitations on "core First Amendment rights." *In re Primus, supra,* 436 US at 432 (citing *Buckley v. Valeo, supra,* 424 US at 44-45).

Judged by that exacting standard, application of the disciplinary rule against soliciting a client impermissibly infringed Primus' First Amendment rights. The solicitation letter did not involve undue influence, overreaching, misrepresentation, or invasion of privacy — the substantive evils that the bar rule was meant to alleviate. Neither did there appear to be any danger of conflict of interest or of the creation of a frivolous lawsuit. 436 US at 435-37. "At bottom," the Court held,

> "the case against [Primus] rests on the proposition that a

> State may regulate in a prophylactic fashion all solicitation activities of lawyers because there may be some potential for overreaching, conflict of interest, or other substantive evils whenever a lawyer gives unsolicited advice and communicates an offer of representation to a layman. Under certain circumstances, that approach is appropriate in the case of speech that simply 'propose[s] a commercial transaction[.]' In the context of political expression and association, however, a State must regulate with significantly greater precision."

*Id.* at 437-38 (citations omitted) (footnote omitted). On the other hand, *had* Primus' actions been such as to involve undue influence, overreaching or the like, it seems clear that the Court's approach would have paralleled that in *Ohralik.* Not even the political nature of Primus' offer entirely immunized her from scrutiny.

This case is not like *Primus.* The Canon here does not sweep so broadly as did the disciplinary rule there. Solicitation of funds by a surrogate of the judge's choice is permissible; only personal solicitation by the judge is foreclosed. The limitation on the Accused's protected First Amendment expression and association is far less extensive than was the limitation in *Primus.* Equally important is the fact that the Canon forbids direct expression by the Accused on one extremely narrow subject only, *viz.,* a request for a campaign contribution. The Accused is free to urge his candidacy on anyone in any other way. The activity of the Accused in this case far more resembles the in-person solicitation of clients, with its inherent dangers of overreaching and undue influence, which the Supreme Court held could be forbidden in *Ohralik,* than it does the solicitation of a client to carry forward a civil liberties cause that the Supreme Court found to be protected in *Primus.*

Although case law on the issue before us is not exactly legion, the Accused has cited no case (and we have found none) in which a court has sustained an argument that a judge is excused entirely by the First Amendment from complying with the Canons of Judicial Conduct. Cases to the contrary include *In re Kaiser,* 111 Wash 2d 275, 287-89, 759 P2d 392 (1988) (upheld sanctioning judge for campaign statements that included, in a nonpartisan race, statements clearly intended to indicate the candidate's long-time affiliation with

a particular political party); *Nicholson v. State Com'n on Judicial Conduct,* 50 NY 2d 597, 431 NYS 2d 340, 409 NE2d 818 (1980); and *Morial v. Judiciary Comm. of State of La.,* 565 F2d 295 (5th Cir 1977) *cert den* 435 US 1013 (1978) (upheld prohibition against sitting judge seeking other, non-judicial office).

In summary, although we accept the analytical framework that the Accused and the dissent invoke in this sensitive First Amendment area, our analysis under the approach of *Ohralik* and *Primus* leads us to conclude that Canon 7B(7) does not violate the First Amendment rights of the Accused. The degree of interference with the First Amendment rights of the judicial candidate is minimal, the state's interest in protecting the integrity of its judiciary is profound, and the means chosen to carry out the state's purpose are the least intrusive possible if there is to be any chance to achieve the desired aim.[13]

## SANCTION

The Commission carefully and thoughtfully explained its reasoning in selecting a recommended sanction. Because the Commission's analysis substantially mirrors our own, we set it out at some length:

"The Commission unanimously recommends that the Oregon Supreme Court censure [the Accused] in the strongest terms.

"The rule against personal solicitation is not a mere technicality. At the root of this requirement is the obligation of judges and judicial candidates alike to maintain the independence and impartiality of the judicial system, both in fact and in terms of the public's perceptions. When a judge personally solicits campaign contributions, lawyers, litigants and citizens may come to believe that the Judge will be influenced in

---

[13] The dissent's contrary conclusion relies almost exclusively on *freedom of political association* cases, *e.g., Eu v. San Francisco County Democratic Central Committee,* 489 US 214, 109 S Ct 1013, 103 L Ed 2d 271 (1989), *Tashjian v. Republican Party of Connecticut,* 479 US 208, 107 S Ct 544, 93 L Ed 2d 514 (1986), and *Geary v. Renne,* 911 F2d 280 (9th Cir 1990). Even from those cases, the dissent wrings primarily glittering generalities — certainly, nothing in any of them *holds* contrary to the result we reach here. It is disturbing, however, that the dissent fails to see where the logic of following those cases necessarily leads. If "freedom of political association" sweeps so broadly, it would follow that Oregon's nonpartisan judicial election system would be unconstitutional. A judge could run as a Democrat or Republican, for example. Such certainly seems the next step after *Geary,* the Ninth Circuit decision on which the dissent relies but which (to be candid) we suspect is (even on its own terms) wrongly decided.

the future by direct knowledge of who has contributed to his or her campaign. The Canon is aimed at promoting public confidence in the integrity of the judicial system by insulating a judicial candidate from the solicitation of campaign contributions. The Canon also serves to protect members of the bar from direct pressure and solicitation by judges before whom they may appear on a regular basis. Violation of the canon politicizes, and damages the integrity of, the judicial election process.

"* * * * *

"[The Accused] has admitted that he personally solicited campaign contributions as a routine matter throughout his campaign in total disregard of a rudimentary, yet essential, tenet of judicial election campaigns. Such disregard for a judicial canon is particularly discomforting when the person in violation is a Supreme Court Justice. The Supreme Court is Oregon's most visible court. Thus, the conduct of its members reflects upon all judges of the State. Moreover, the Oregon [C]onstitution vests in the Supreme Court the ultimate responsibility to discipline judges who violate the law or rules of judicial conduct. A Justice of the Supreme Court, who sits in judgment for the conduct of other judges, must scrupulously adhere to the rules which the Supreme Court itself has adopted. In short, a Justice of the Oregon Supreme Court must be held to the highest standard for judicial ethics. By violating the Court's own ethical rules, [the Accused] failed to meet the standard of conduct expected of the high office to which he was elected.

"The Commission has had difficulty determining the appropriate sanction to recommend to the Supreme Court. The Commission has taken into account a number of factors, including whether [the Accused's] violations were likely to have affected the outcome of the election. Some considerations pointed towards a more severe sanction, and there was some support on the Commission to go beyond a censure. * * *

"On balance, though, the Commission believes that public censure in the strongest terms by the Supreme Court is the sanction which best fits the circumstances of this case. * * * [The Accused] * * * admitted his violations and voluntarily provided many details about them. Certainly, the ignominy of being the first Supreme Court Justice in Oregon to be subjected to discipline by his colleagues is no minor penalty. The Commission therefore unanimously recommends that [the] Oregon Supreme Court publicly censure [the Accused]."

We agree that censure is the appropriate sanction. There can be no doubt from this record that the Accused wilfully violated Canon 7B(7). On the other hand, there was nothing surreptitious or underhanded about his conduct. He not only admitted his actions, but also assisted the Commission in identifying the extent to which he had had personal contact with potential contributors to his campaign. We have no reason to think that the incidents will be repeated or that the Accused requires any greater sanction than the publication of this opinion and the publicity attendant to this proceeding.

The Accused is censured.

**UNIS, J.,** concurring in part, dissenting in part.

Today this court holds that it has the extraordinary power—not possessed by the other heretofore equal executive and legislative branches of government—to adopt and enforce rules of judicial conduct that violate the Oregon Bill of Rights.

I agree that the Commission on Judicial Fitness and Disability (Commission) and this court have jurisdiction over both the subject matter of the Accused's alleged violation of Canon 7B(7) and over the person of the Accused, as a candidate for an elective judicial office and as an Associate Justice of this court. To that extent, I concur.

I cannot, however, accept the majority's reasoning that, because Oregon voters in 1976 added subsection (e) to Article VII (Amended), section 8, of the Oregon Constitution, "expression of opinion" and "speech" rights guaranteed by Article I, section 8, of the Oregon Constitution must be subordinated to a conflicting rule of judicial conduct promulgated by this court. Moreover, I believe that mere personal solicitation of campaign funds by a candidate for elective judicial office in Oregon's constitutionally mandated elective system is protected speech under Article I, section 8, of the Oregon Constitution, in the absence of a showing by the government that a "highly likely" effect of such solicitation is actual harm to the judicial office. In this case, the government has made no such showing. I would, therefore, hold that Canon 7B(7), *as applied* to the conduct for which the Accused is charged in this case, violates Article I, section 8. Because the government has failed to show that the ban on the mere personal request for

campaign funds by a candidate for elective judicial office serves a compelling state interest, I would hold that Canon 7B(7), *as applied* to the conduct for which the Accused is charged in this case, violates the First and Fourteenth Amendments to the United States Constitution.

I would dismiss the complaint that the Commission has brought against the Accused. For these reasons, I respectfully dissent with respect to the constitutional analyses.

## I.
## OREGON CONSTITUTION, ARTICLE I, SECTION 8

"Article I, section 8 [of the Oregon Constitution],[1] separately precludes laws 'restraining the free expression of opinion' as well as laws 'restricting the right to speak, write, or print freely' * * *." *State v. Henry,* 302 Or 510, 515, 732 P2d 9 (1987) (discussed in Note, *State v. Henry: A Rational Approach to the Extension of Individual's Rights,* 67 Or L Rev 507 (1988)). "The text of Article I, section 8, is broader [than the First Amendment of the Federal Constitution] and covers any expression of opinion * * *." *Id.* "The nature of the prohibition, either civil or criminal, is immaterial to the first sentence of Article I, section 8, which directs that 'no law' shall restrict or restrain speech, writing and printing." *City of Hillsboro v. Purcell,* 306 Or 547, 553, 761 P2d 510 (1988). Article I, section 8, protects "free expression of opinion" and "speech" rights from intrusion by any branch of the government: the legislative, the executive and the judiciary.[2]

### A. *Method of Analysis*

To determine whether a governmental enactment—a statute,[3] an ordinance,[4] or a disciplinary rule,[5] is unconstitu-

---

[1] Article I, section 8, of the Oregon Constitution provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

[2] *See Lloyd Corporation v. Whiffen,* 307 Or 674, 680, 773 P2d 1294 (1989) (a court must observe constitutional principles as much as the other branches of government).

[3] *See, e.g., Oregon State Police Assn. v. State of Oregon,* 308 Or 531, 783 P2d 7 (1989) (statutory provision which purports to deny state police officers all participation in political activities beyond voting held unconstitutional); *State v. Henry,* 302 Or 510, 732 P2d 9 (1987) (statute criminalizing knowing dissemination and possession of

tional under Article I, section 8, this court's decisions during the past decade suggest a method of analysis. I will first set forth that methodology and then apply it to this case.

The first inquiry in our assessment whether a governmental enactment violates Article I, section 8, of the Oregon Constitution is whether that enactment *on its face* restrains the "free expression of opinion" or restricts the "right to speak" on any subject whatever. *State v. Moyle,* 299 Or 691, 695, 705 P2d 740 (1985); *see also State v. Robertson,* 293 Or 402, 412, 649 P2d 569 (1982) (*quoting State v. Spencer,* 289 Or 225, 228, 611 P2d 1147 (1980)).

If the enactment restrains the "free expression of opinion" or restricts the "right to speak," then a second inquiry is necessary. That inquiry is whether the restraint or restriction was well established when the first American guarantees of freedom of speech were adopted and is one that those guarantees demonstrably were not intended to abolish. *State v. Henry, supra,* 302 Or at 514, 521; *see also City of Hillsboro v. Purcell, supra,* 306 Or at 554-55; *City of Portland v. Tidyman,* 306 Or 174, 179, 759 P2d 242 (1988); *State v. Moyle, supra,* 299 Or at 695-96; *Id.* at 709, n 1 (Linde, J., concurring); *State v. Robertson, supra,* 293 Or at 412, 416; *In re Lasswell,* 296 Or 121, 124, 673 P2d 855 (1983). Examples are "perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud and their contemporary variants." *State v. Henry, supra,* 302 Or at 515 (*quoting State v. Robertson, supra,* 293 Or at 412).

> "[T]he constitutional guarantee of free speech * * * will not be overcome by the mere showing of some legal restraints on one or another form of speech or writing. The party opposing a claim of constitutional privilege [*i.e.*, the government] must demonstrate that the guarantees of freedom of expression were not intended to replace the earlier restrictions."

obscene material invalidated); *State v. Robertson,* 293 Or 402, 649 P2d 569 (1982) (statute creating and defining the crime of coercion invalidated).

[4] *See, e.g., City of Portland v. Tidyman,* 306 Or 174, 759 P2d 242 (1988) (portion of city zoning ordinance regulating "adult businesses" struck down); *City of Hillsboro v. Purcell,* 306 Or 547, 761 P2d 510 (1988) (so-called "Green River ordinance" that prohibited selling merchandise door-to-door held infirm for overbreadth).

[5] *See, e.g., In re Lasswell,* 296 Or 121, 673 P2d 855 (1983) (professional disciplinary rule narrowly interpreted by court survived constitutional challenge).

*State v. Henry, supra,* 302 Or at 521. If the government demonstrates that the enactment falls within such an established exception, then the enactment will not, on its face, violate Article I, section 8. *State v. Moyle, supra,* 299 Or at 695; *State v. Robertson, supra,* 293 Or at 412, 416. In that event, this court will scrutinize the enactment to determine whether it appears to reach privileged "expression of opinion" or "speech" or whether it can be interpreted to avoid such overbreadth.[6] *State v. Moyle, supra,* 299 Or at 702; *State v. Robertson, supra,* 293 Or at 417-18. If we are able to discern the intended boundaries of an overbroad law, we will narrow it to the constitutional confines intended by the lawmakers. *State v. Moyle, supra,* 299 Or at 702-05. "If the [enactment] potentially reaches substantial areas of communication that would be constitutionally privileged and that cannot be excluded by a narrow interpretation or left to a case-by-case defense against the application of the [enactment], it would be unconstitutional." *Id.*

If the enactment's restraint or restriction does not involve speech that was historically intended to be excepted from Article I, section 8, then a third inquiry is necessary. That question is whether the focus of the enactment, as written, is on an identifiable actual effect or harm that may be proscribed, rather than on the communication itself. *See id.* at 695; *City of Portland v. Tidyman, supra,* 306 Or at 192 (Gillette, J., concurring). *See also Oregon State Police Assn. v. State of Oregon,* 308 Or 531, 536, 783 P2d 7 (1989); *Id.* at 541 (Linde, J., concurring) ("law must specify expressly or by clear inference what 'serious and imminent' effects it is designed to prevent"). A "[s]tatute[] directed at an *effect* of speech may be constitutional unless the statute is overbroad." (Emphasis in original.) *Id.* at 536. If the enactment spells out the actual

---

[6] "[A] claim of 'overbreadth' asserts that the terms of a law exceed constitutional boundaries, purporting to reach conduct protected by guarantees such as, for instance, Oregon Constitution, article I, section 8 (freedom to speak and write) * * *." *State v. Robertson, supra,* 293 Or at 410. " '[A] law is overbroad to the extent that it announces a prohibition that reaches conduct which may not be prohibited,' " *quoting State v. Blocker,* 291 Or 255, 261, 630 P2d 824, 827 (1981).

This court is obligated, "before invalidating a textually overbroad statute[,] to see whether it can be interpreted so as to save the legislative purpose as far as the constitution permits, leaving only marginal instances of potentially unconstitutional application to case-by-case decision." *Cooper v. Eugene Sch. Dist. No. 4J,* 301 Or 358, 378, 723 P2d 298 (1986), *appeal dismissed* 480 US 942 (1987).

harm in its text, rather than prohibiting or restricting the use of words, then the law will not be held, on its face,[7] to violate Article I, section 8. Instead, it will be scrutinized to determine whether it appears to reach protected communications[8] or whether it can be narrowly interpreted to limit its reach to situations where harm occurs, and thus to avoid such overbreadth.[9] If the answer to the third inquiry is that the enactment proscribes expression or the use of words, rather than harm, it violates Article I, section 8,[10] *unless* there is a claim, as here, that infringement on otherwise constitutionally protected speech is justified under the "incompatibility exception" to Article I, section 8. In that event, a fourth inquiry needs to be addressed.

The fourth inquiry is whether the speech that may not constitutionally be prohibited outright is nevertheless incompatible with the performance of one's special role or function. This court has recognized that there are some activities that lawmakers could not forbid citizens generally from doing, but that they may declare to be incompatible with the role and work of a public official. Examples are: *In re Lasswell, supra* (professional disciplinary rule survived the accused's constitutional challenge, because this court narrowly interpreted it so as to limit its coverage, in the words of Article I, section 8, to a prosecutor's "abuse" of the "right to speak,

---

[7] A facial challenge to a law is a claim that the law, as written, is "invalid in toto." *Village of Hoffman Estates v. Flipside Hoffman Estates, Inc.,* 55 US 489, 494 n 5, 102 S Ct 1186, 71 L Ed 2d 362 (1982), quoting *Steffel v. Thompson,* 415 US 432, 474, 94 S Ct 1209, 39 L Ed 2d 505 (1974).

[8] *See State v. Robertson, supra,* n 3 (statute at issue that prohibited causing a harmful effect, coercing another into undesired conduct, invalidated for overbreadth, because it specified coercion by threats, which covered privileged as well as unprivileged speech).

[9] *Compare State v. Moyle,* 299 Or 691, 705 P2d 740 (1985) (overbroad antiharassment statute prohibiting a person from causing another harm narrowed to the constitutional confines intended by lawmakers) *with City of Hillsboro v. Purcell, supra,* n 4 (overbroad ordinance could not be narrowed to constitutional confines intended by lawmakers where court was unable to discern its intended boundaries).

[10] *See State v. Spencer,* 289 Or 225, 611 P2d 1147 (1980) (disorderly conduct statute held unconstitutional because the statute made the use of certain kinds of words illegal, if spoken with a specific intent, regardless of whether the words had the intended effect on the hearer; the statute was held to be directed toward speech itself, not toward the prevention of a specified harm); *State v. Ray,* 302 Or 595, 733 P2d 28 (1987) (this court, finding no such well-established and demonstrably preserved historical exception for "obscenity," invalidated a law against telephone harassment that was written in terms describing the forbidden content of speech).

write, or print freely on any subject whatever"); *Cooper v. Eugene School Dist. No. 4J,* 301 Or 358, 380, 723 P2d 298 (1986), *appeal dismissed* 480 US 942 (1987) (discussed in casenote, 23 Willamette L Rev 955 (1987)) (a statute could validly restrict public school teachers' rights under Article I, sections 2 and 3 (freedom of worship and religious opinion guarantees), if the statute was limited to "circumstances when a teacher's dressing in accordance with the standards of his or her religion is truly incompatible with the school's commitment to maintaining for its students [an] atmosphere of religious neutrality[.]" 301 Or at 380); and *Burt v. Blumenauer,* 299 Or 55, 699 P2d 168 (1985) (public advocacy of a vote for or against a disputed ballot measure, normally the essence of individual free speech, may in some circumstances be incompatible with an individual's public duties).[11] An enactment that infringes on speech, and that is not justified under the "incompatibility exception," cannot survive an Article I, section 8 challenge.

B. *Analysis of the Case under Article I, Section 8*

1. *Canon 7B(7), As Written, Impinges on Article I, Section 8 Rights.*

The prohibition embodied in Canon 7B(7), on its face (as written, by its terms), restrains the "free expression of opinion" and restricts the "right to speak." Or Const, Art I, § 8. Canon 7B(7), which applies to any judicial candidate, Canon 7D, states: "A judge may not * * * personally solicit campaign contributions * * *." The canon's ban directly affects political speech (which includes the freedom to publicize political views), the inviolability of which rests at the core of our electoral process and of Article I, section 8 freedoms.[12] *See Oregon State Police Assn. v. State of Oregon, supra,*

---

[11] The "incompatibility exception" thus applies only when the breach of the governmental provision may result in disqualification from an assignment or office or other civil or regulatory sanctions; it does not apply when the sanction for the breach of the governmental provision is penal (criminal) in nature. *See Oregon State Police Assn. v. State of Oregon,* 308 Or 531, 539-41, 783 P2d 7 (1989) (Linde, J., concurring); *City of Hillsboro v. Purcell, supra,* 306 Or at 553; *In re Lasswell, supra,* 296 Or at 125.

[12] Canon 7B(7)'s ban on personal solicitation of campaign contributions also implicates the political right to association guaranteed by Article I, section 26. *See City of Hillsboro v. Purcell, supra,* 306 Or at 556, n 9, where we said:

"Not only would a total ban on soliciting financial support from persons in their homes (either on the doorstep, by telephone or by post) face free speech attack under Article I, section 8, *see State v. Moyle,* 299 Or 691, 705 P2d 740 (1985), it

308 Or at 536 ("[p]olitical speech is an essential form of expression protected by Article I, section 8"); *Cooper v. Eugene Sch. Dist. No. 4J, supra,* 301 Or at 377 (political expression described as "the essence of individual free speech"). *See also Ivancie v. Thornton,* 250 Or 550, 553, 443 P2d 612 (1968), *cert den* 383 US 1018 (1969); *Minielly v. State,* 242 Or 490, 499, 411 P2d 69 (1966).[13]

Because Canon 7B(7) impinges on Article I, section 8 ·rights, it is necessary to proceed to the second inquiry in our analysis.

2. *Canon 7B(7) Does Not Restrain "Expression of Opinion" or Speech That Was Historically Intended to be Excepted From Article I, Section 8.*

The Commission has not met its burden of demonstrating that the proscription in Canon 7B(7) is a restraint that was well established when the free speech guarantees were adopted and is one that those guarantees were demonstrably not intended to abolish. As this court stated in *State v. Henry, supra,* 302 Or at 521, "[t]he constitutional guarantee of free speech * * * will not be overcome by the mere showing of some legal restraints on one or another form of speech or writing."[14] The majority does not attempt to justify Canon 7B(7) under a historical exception to Article I, section 8, 310 Or at 560. Nor will I.

The Commission cites no authority to support its assertion that solicitation of campaign funds by a candidate for an elective judicial office or, for that matter, by a candidate for any elective office in Oregon, was restricted at the time the

---

implicates Article I, section 26, as well. Article I, section 26, of the Oregon Constitution provides:

" 'No law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner to consult for their common good; nor from instructing their Representatives; nor from applying to the Legislature for redress of grievances (sic).' "

[13] *See also Deras v. Myers,* 272 Or 47, 52-64, 535 P2d 541 (1975) (law which restricted the amount of money which can be expended to support or oppose a candidate for public office held violative of Article I, section 8, of the Oregon Constitution).

[14] In *State v. Henry, supra,* n 3, this court, finding no such well established and demonstrably preserved historical exception for "obscenity," invalidated a law against disseminating obscene material that was written in terms of describing forbidden control of speech or printed material.

free speech guarantees were adopted. It was not until 1924 that the original Canons of Judicial Ethics were adopted by the American Bar Association. *See* Armstrong, *Code of Judicial Conduct,* 26 Southwestern L J 708 (1972). The first Oregon enactment on the subject of soliciting campaign funds was in 1975, when this court promulgated the original Oregon Code of Judicial Conduct. Included in that code was *former* Canon 7B(2), which stated in hortatory language that a candidate for judicial office *"should* not himself solicit campaign funds."* (Emphasis added.) In 1983, Canon 7B(7), the subject of this proceeding, was enacted.

Because Canon 7B(7) restrains speech and does not fit a historical exception, we must address the third inquiry in our analysis under Article I, section 8.

3. *Canon 7B(7) is Directed at Speech, Not at a Specified Actual Harm.*

The Commission concedes, as it must, that Canon 7B(7) proscribes a type of communication, rather than identifying a forbidden effect. Canon 7B(7)'s ban is directed at speech itself, not toward the prevention of a specified harm. It is, therefore, invalid under Article I, section 8, unless the infringement on speech is justified under the "incompatibility exception." Because the Commission makes such a claim, I turn to the fourth inquiry in our analysis.

4. *The Incompatibility Exception Does Not Apply.*

The fourth inquiry is the heart of my disagreement with the majority in its analysis of Article I, section 8. The majority relies on *In re Lasswell, supra,* to hold that Canon 7B(7)'s prohibition on the Accused's political speech rights is justified by "societal interest in judicial integrity and the appearance of judicial integrity." 310 Or at 564. The majority states:

> "The analogy between *Lasswell* and the present case is obvious: each case involves the regulation of speech of a public servant, each involves an allegation of violation of a code of professional conduct, and each involves a claim of conflict between the code of professional conduct and the protection of Article I, section 8."

310 Or at 563.

"The disciplinary rule in [*Lasswell*] was constitutional because of the relatively minimal burden it placed on the District Attorney's ability to speak. * * * The same rationale justifies Canon 7B(7)."

310 Or at 563.

The majority misreads *Lasswell*. The majority redefines the contours of the incompatibility exception and, in so doing, substantially reduces the free speech guarantees of our state constitution. To demonstrate flaws in the majority's reasoning, I will first set forth the standards that this court has articulated about the incompatibility exception and then apply them to this case.

In *Lasswell*, this court gave birth to the incompatibility exception. The court recognized that speech that could not constitutionally be prohibited outright may nevertheless, under narrowly defined circumstances, be found incompatible with the performance of one's special role or function. *See also Oregon State Police Assn. v. State of Oregon, supra,* 308 Or at 540 (Linde, J., concurring). In *Lasswell,* this court held that an attorney disciplinary rule could constitutionally restrict prosecutors from commenting publicly on *pending cases with which they are associated* if the rule was narrowly limited to *actual incompatibility* between the speech and the prosecutor's official function, including his responsibility to preserve the person's right to a fair trial by an impartial jury. In *Lasswell,* we held that the test to be applied in determining whether a prosecutor's comments constitute a violation of the disciplinary rule is whether:

"[I]t is *incompatible* with [the prosecutor's] professional performance *in a concrete case* to make extrajudicial statements on the matters covered by the rule either with the intent to affect the factfinding process in the case, or when a lawyer knows or is bound to know that the statements pose a serious and imminent threat to the process and acts with indifference to that effect. In a subsequent disciplinary inquiry, therefore, the question is not whether the tribunal believes that the lawyer's comments impaired the fairness of an actual trial, which may or may not have taken place. The question, rather, is the lawyer's intent or knowledge and indifference *when making published statements* that were highly likely to have this effect." (Emphasis added.)

296 Or at 126. The professional disciplinary rule in *Lasswell*

"survive[d] the accused's constitutional challenge" under Article I, section 8, because this court narrowly interpreted it "to limit its coverage, in the words of [A]rticle I, section 8, to a prosecutor's 'abuse' of the right 'to speak, write, or print freely on any subject whatever.' " 296 Or at 125.

Analysis of whether the incompatibility exception applies begins with the question of whether the state could require citizens generally to refrain from the otherwise constitutionally protected speech. *Oregon State Police Assn. v. State of Oregon, supra,* 308 Or at 540-41 (Linde, J., concurring). If so, the enactment is valid. If not, the question then is whether the governmental constraint is justified by the special role or function performed by the person. *Id.; In re Lasswell, supra.*

The incompatibility between the particular privileged speech and the performance of one's special role or function need not be spelled out in the text of the enactment, but it must be shown by the government to be a "highly likely" effect. *In re Lasswell, supra,* 296 Or at 126. Incompatibility, which is always related to state action, is *assessed at the time the individual chooses what to speak or write. In re Lasswell, supra,* 296 Or at 126; *Oregon State Police Assn. v. State of Oregon, supra,* 308 Or at 541 (Linde, J., concurring). It is not simply assumed at the time of the enactment of the governmental provision. *Id.* (Linde, J., concurring). Incompatibility cannot, in other words, be legislated in the abstract or by a generalized finding; it must be shown to be a "highly likely" effect in a concrete case. *In re Lasswell, supra,* 296 Or at 126. "Our cases under Article I, section 8, preclude using apprehension of unproven effects as a cover for suppression of undesired expression * * *." *City of Portland v. Tidyman, supra,* 306 Or at 188. A mere likelihood of incompatibility will not, therefore, suffice.

Turning now to the present case, I begin with the question whether the state could, by law, forbid candidates for elective office generally from personally soliciting campaign funds. Article IV, section 4, of the Federal Constitution directs that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government[.]" Implicit in the Guarantee Clause is "a duty on the part of the States themselves to provide such a government." *Minor v. Happersett,* 88

US (21 Wall.) 162, 175 (1874). A republican form of government is "a government which derives all its powers directly or indirectly from the great body of the people." The Federalist No. 39 at 112 (J. Madison) (R. Fairfield ed 1981). It is "constructed on this principle, that the supreme Power resides in the body of the people." *Chisholm v. Georgia,* 2 US (2 Dall) 419, 457 (1793) (opinion of Wilson, J.). As stated by the United States Supreme Court in *In re Duncan,* 139 US 449, 461 (1891), "the distinguishing feature" of a republican form of government "is the right of the people to choose their own affairs for governmental administration, and pass their own laws."

"The principles of representative government [are] enshrined in our [Oregon and Federal] constitutions." *Burt v. Blumenauer, supra,* 299 Or at 67. Illustrative of those principles in the Oregon Constitution are: the provisions mandating the election of public officials;[15] Article II, section 1: "All elections shall be free and equal"; Article I, section 8: "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever"; Article I, section 26, respecting specially the political right of the "inhabitants of the State" to "consult for the common good," and to "[instruct] their Representatives"; and Article III, section 1: that "[t]he Government shall be divided in three seperate (sic) departments, the Legislative, the Executive, including the administrative, and the Judicial * * *."

It is too often forgotten that elections exist for Oregon's people, not for candidates or parties. It is through the political process of election and representation that the public maintains control over government; with victory at the polls comes with it the right to govern. An essential feature of representative government is the presentation to the electorate of varying points of view. Members of the public have the right to make informed choices and select candidates for office on whatever basis they deem relevant. Free discussion helps the citizens to become informed, so they can vote intelligently

---

[15] The Oregon Constitution, for example, mandates the election of the Governor, *see* Article V, section 4; members of the Oregon Legislative Assembly, *see* Article VI, section 1; Secretary of State, *id.;* State Treasurer, *id.,* and certain county officers, *see* Article VI, section 6.

for those who represent them. Free speech is, therefore, intimately related to the process of governing. Representative democracy would be meaningless without the protections of free speech on political matters, guaranteed by Article I, section 8, and the rights of political association, guaranteed by Article I, section 26. Those provisions permit the public to govern itself by conducting a critical examination of all choices of personnel and policy affected by the electoral process.[16]

A constitutionally mandated electoral process based on public choice necessarily requires that candidates for public office must have the financial means to make that choice possible. Elections require campaigns. Campaigns require funds.[17] Today, for example, candidates for elective partisan office no longer can look to the party to assume responsibility for the cost of their campaigns. Oregon does not have any "public fund" from which public officials and would-be public officials may obtain financial assistance to help them publicize and promote their messages to the public. Moreover, the media of campaigning is privately owned. Campaigns and the resultant contributions to those campaigns are, therefore, necessary components of the electoral process. Campaign costs for all means of communication have escalated comparably - and rapidly - and the need for public officials and would-be public officials to engage in serious fundraising activities continues to grow each year.

Surely, it is unquestioned that a statute prohibiting

---

[16] In *Deras v. Myers, supra,* 272 Or at 55, this court "recognize[d] the importance of the electorate's liberties of expression of opinion and assembly in the over-all system of government established by our state and federal constitutions" and that "[t]hese rights have been termed the 'cornerstone of democracy' and so important as to require 'breathing space' and protection * * *." In *Deras,* 272 Or at 62, in holding that a statute limiting campaign expenditures violates Article I, section 8, of the Oregon Constitution, this court stated:

"[The law] closes or impedes important channels of communication on public issues and thus denies citizens freedom of expression where the protection of that constitutional right is the most necessary to preserve our system of government."

This court reiterated that principle in *Oregon State Police Assn. v. State of Oregon, supra,* 308 Or at 536, n 6.

[17] For an interesting discussion concerning the costs of recent judicial campaigns, see *Geary v. Renne,* 911 F2d 280, 291-92 (CA 1990) (Reinhardt, J., concurring).

candidates from personally soliciting *support* for their campaigns could not survive a constitutional challenge under Article I, section 8.[18] Oregon's constitutionally mandated electoral system that bases itself on public choice anticipates the need for candidates for elective public office to go directly to the people to ask for support. It also anticipates the need for candidates personally to request funds necessary to finance their campaigns. Normal communications of candidates for public office include, in other words, requests for support and personal requests for campaign funds. A ban on personal solicitations of campaign funds also implicates Article I, section 26. *See City of Hillsboro v. Purcell, supra,* 306 Or at 556, n 9.[19]

The personal solicitation of campaign support *and* funds by candidates for elective office generally is, therefore, *compatible* with those candidates' roles in Oregon's constitutionally mandated electoral process. If the people of the State of Oregon wish to require, as they do, the election of public officials, then it follows that the legislature cannot, consistent with Article I, section 8, forbid all candidates for elective public office from personally soliciting campaign funds.

Because the lawmakers cannot forbid candidates for elective public office *generally* from personally soliciting campaign funds, the question then is whether the lawmakers (in this proceeding, the rulemakers) nevertheless may forbid the personal solicitation of campaign funds by a *judicial* candidate on the basis that it is incompatible with the role or function of a judge. To phrase the question in the context of this case and within the principles this court has previously stated concerning the "incompatibility exception" to Article I, section 8, of

---

[18] Such a statutory provision also implicates the candidates' and voters' protected rights of association and participation guaranteed by Article I, section 26, of the Oregon Constitution. "* * * Oregon's Bill of Rights guarantees * * * the specifically political right of the inhabitants of the State 'to consult for their common good,' to instruct their representatives, and to apply to the legislature for redress of grievances, [A]rticle I, section 26." *In re Richmond,* 285 Or 469, 474, 591 P2d 728 (1979).

[19] In *City of Hillsboro v. Purcell, supra,* n 4, in holding that a local government had authority to regulate door-to-door solicitation by ordinance, subject to constitutional limitations, but the so-called "Green River ordinance" in question was overbroad and, therefore, invalid under Article I, section 8, of the Oregon Constitution, because it prohibited all solicitation for any purpose at any time, we said:

"Not only would a total ban on soliciting financial support from persons in their homes (either on the doorstep, by telephone or by post) face free speech attack under Article I, section 8, *see State v. Moyle,* 299 Or 691, 705 P2d 740 (1985), it implicates Article I, section 26, as well."

the Oregon Constitution: Has the Commission shown that a "highly likely" effect of the Accused's admitted mere personal solicitation of campaign contributions is actual harm to the judicial office? Without addressing it, and *a fortiori* without answering it, the majority concludes that Canon 7B(7) is constitutionally justified by "societal interest in judicial integrity and the appearance of judicial integrity." The majority reasons:

> "The stake of the public in a judiciary that is both honest in fact and honest in appearance is profound. A democratic society that, like ours, leaves many of its final decisions, both constitutional and otherwise, to its judiciary is totally dependent on the scrupulous integrity of that judiciary. A judge's direct request for campaign contributions offers a *quid pro quo* or, at least, can be perceived by the public to do so. Insulating the judge from such direct solicitation eliminates the appearance (at least) of impropriety, and, to that extent, preserves the judiciary's reputation for integrity. On the other side of the ledger, the candidate is not seriously impaired either in the ability to solicit and receive funds — a committee is permitted to do that — or in the ability otherwise to communicate the candidate's position on any issues the candidate is entitled to address — something the candidate himself or herself may do, as long as the message does not include a request for funds."

310 Or at 563.

The majority's reasoning is flawed for several reasons. First, because the public has a profound "interest in judicial integrity and the appearance of judicial integrity," there is simply no reason to associate, or to assume that the electorate would associate, a judicial candidate's personal request for campaign funds, *by itself,* with corruption, bribery, dishonesty, the purchase of justice, or any other particular impropriety. In *Deras v. Myers, supra,* this court held that a statute restricting the amount of money that can be spent to support or oppose candidates for public office violated Article I, section 8. The court concluded that money was *not* a corrupting influence in political campaigns when the proponents of the law limiting campaign spending had made *no factual record to support such a conclusion.* 272 Or at 55. *See also* Willner, *A Second Look at Constitutional Interpretation in Pioneer and Populist State,* 67 Or L Rev 93, 103-04 (1988).

The majority's conclusion that personal solicitation of campaign funds by a judicial candidate, otherwise constitutionally protected political speech, is justified and, therefore, constitutional because it is incompatible with the judicial office is a bare conclusion, supported only by speculation. The conclusion is inconsistent with Oregon's constitutional mandate of elected judges.

The majority has not required the state to show *actual harm* to the judicial office to be a *"highly likely"* effect of the Accused's personal solicitations of campaign funds, as our prior decisions require. *See, e.g., In re Lasswell, supra.* Rather than assessing incompatibility at the time the Accused personally made his requests for campaign funds, *see id.* at 126; *Oregon State Police Assn. v. State of Oregon, supra,* 308 Or at 541 (Linde, J., concurring), the majority improperly assumes incompatibility on the basis of an abstract, generalized, unsupported finding "that Canon 7B(7)'s prohibition on the [A]ccused's political speech rights is justified by societal interest in judicial integrity and the appearance of judicial integrity." 310 Or at 564.

There is simply not one iota of evidence in the record in this proceeding or empirical data of which this court is aware to support the majority's conclusion that the health of the judiciary, or its image, was in fact harmed by the Accused's personal solicitation of campaign funds. There is only surmise.

Moreover,

"[t]his court * * * phrase[d] the constraints of the Oregon Code of Judicial Conduct on political activity of judges. * * * Canon 7 does not forbid 'political activity' as such (defined in the canon as including to speak publicly, to [contribute or solicit] funds, [services or property], or to lend one's name to a political purpose or a political organization), but only when the political activity produces one of four [effects stated in Canon 7A] that the drafters considered incompatible with judicial office."

*Oregon State Police Assn. v. State of Oregon, supra,* 308 Or at 541 (Linde, J., concurring). Those four effects stated in Canon 7A are "political activity" that:

"(1) involves persons, organizations or specific issues

that will require a judge's disqualification under Canon 3(C); or

"(2) creates a reasonable doubt about a judge's impartiality toward persons, organizations or factual issues that foreseeably may come before the court on which the judge serves, whether or not actual disqualification becomes necessary; or

"(3) lends the support of the judicial office (as distinct from the judge as a private individual) to a cause other than the administration of justice; or

"(4) jeopardizes the confidence of the public or of government officials in the political impartiality of the judicial branch of government."

"[T]he effect * * * has to be assessed at the time of the political activity; it is not simply assumed at the time of the enactment [of Canon 7]." *Oregon State Police Assn. v. State of Oregon, supra,* 308 Or at 541 (Linde, J., concurring).

Under Canon 7A, a judge or judicial candidate may not solicit campaign funds if it has one of those effects. Conversely, under Canon 7A, solicitation of campaign funds that does not produce any of those effects is not prohibited.

Whether "political activity" that produces one or more of the four effects specified in Canon 7A justifies infringement on otherwise protected speech need not be addressed in this proceeding. The record is devoid of any facts to support a finding that the Accused's personal solicitation of campaign funds produced any of those effects. The "appearance of impropriety" is not one of four effects stated in Canon 7A. "Political activity," such as solicitation of funds, that merely produces the appearance of impropriety is *not* stated in the rule to be incompatible with judicial office. Canon 2 of the Oregon Code of Judicial Conduct, not Canon 7, addresses the "appearance of impropriety":

"A Judge Should Avoid Impropriety and the
Appearance of Impropriety in All Activities

"A. A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

"B. A judge should not allow family, social, or other relationships to influence judicial conduct or judgment. A judge

should not lend the prestige of the office to advance the private interests of others, nor should a judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge should not testify voluntarily as a character witness."

When "should" or "should not" appears in a canon, the text is hortatory; it is not a binding rule under which a judge or judicial candidate may be disciplined. *See* Model Code of Judicial Conduct (August 1990), adopted by the House of delegates of the American Bar Association on August 7, 1990. Avoiding the appearance of impropriety is a laudable goal. The failure of a judge or judicial candidate to avoid such an appearance in his or her exercise of protected speech is not, by itself, a basis for disciplinary action, however.[20]

I recognize that a state need not treat candidates for judicial office the same as candidates for other elective offices. A judicial office is different in key respects from other elective offices. The state may, subject to constitutional constraints, regulate the conduct of its judges with the differences in mind.

"For example the contours of the judicial function make inappropriate the same kind of particularized pledges of conduct in office that are the very stuff of campaigns for most non-judicial offices. A candidate for the mayoralty can and often should announce his determination to effect some program, to reach a particular result on some question of city policy, or to advance the interests of a particular group. It is expected that his decisions in office may be predetermined by campaign commitment. Not so the candidate for judicial office. He [or she] cannot, consistent with the proper exercise of his [or her] judicial powers, bind himself [or herself] to decide particular cases in order to achieve a given programmatic result. Moreover, the judge acts on individual cases and not broad programs."

*Morial v. Judiciary Com'n of State of Louisiana*, 565 F2d 295, 305 (5th Cir 1977), *cert den* 435 US 1013, 98 S Ct 1887, 56 L Ed 2d 395 (1978). A state may require candidates for judicial office to maintain a higher standard of conduct than can be

---

[20] In a speech, entitled "The Oregon Code of Judicial Conduct," at the Oregon Judicial Conference, April 16, 1982, attorney Leslie M. Swanson, Jr. eloquently advocated that the "appearance of impropriety" is fine as an aspirational standard, but it is not, however, something for which judges should be disciplined. It is not, by itself, an interest sufficiently strong to subordinate free speech.

expected in other types of elective contests. Judges and lawyers are members of a responsible profession, and their adherence to their profession's ethical standards may require abstention from what, in other circumstances, would be constitutionally protected behavior. *See, e.g., In re Lasswell, supra.*

Nevertheless, the state cannot require a person who becomes a candidate for judicial office to surrender all speech rights guaranteed by Article I, section 8, of the Oregon Constitution. A professional disciplinary rule that is a restraint on speech by judges because they are judges could not survive a constitutional challenge under Article I, section 8. *See In re Lasswell, supra,* 296 Or at 125; *In re Richmond,* 285 Or 469, 474-75, 591 P2d 728 (1979) (same principle stated for lawyers). Only when the state shows that a "highly likely" effect of personal solicitations for campaign funds is actual harm to the judicial office may such requests be barred.

A judge has an obligation to fulfill the trust placed in him or her, and in the judiciary as a whole, to use the office and power in a manner consistent with the constitutionally required oath of office.[21] "As [that oath of office] show[s], the [Oregon] [C]onstitution does not contemplate that [judges] will act as they think best and leave the constitutionality of their acts to the courts[.]" *Cooper v. Eugene Sch. Dist. No. 4J., supra,* 301 Or at 364, n 7. It should be assumed that judges and lawyers who seek to become judges will abide by their solemn oaths to uphold the integrity and honor of their profession and of the legal system. A judicial candidate's mere personal

---

[21] Article VII, section 7, of the Oregon Constitution provides:

"Every judge of the supreme court, before entering upon the duties of his office, shall take and subscribe, and transmit to the secretary of state, the following oath:

" 'I, _____, do solemnly swear (or affirm) that I will support the constitution of the United States, and the constitution of the State of Oregon, and that I will faithfully and impartially discharge the duties of a judge of the supreme court of this state, according to the best of my ability, and that I will not accept any other office, except judicial offices, during the term for which I have been elected.' "

*See also* Article XV, section 3, of the Oregon Constitution, which provides:

"Every person elected or appointed to any office under this Constitution, shall, before entering on the duties thereof, take an oath or affirmation to support the Constitution of the United States, and of this State, and also an oath of office."

request for campaign funds by itself (unaccompanied by any impropriety) to help defray campaign expenses is protected speech under Article I, section 8, of the Oregon Constitution, in the absence of a showing by the government that a "highly likely" effect of such solicitation is actual harm to the judicial office. The Commission (state) in this case has simply failed to demonstrate a "highly likely" effect of the Accused's personal solicitation of campaign funds is actual harm to the judicial office.

## II.
### ARTICLE VII (AMENDED), SECTION 8, OF THE OREGON CONSTITUTION

The majority reaches what I find to be the astonishing and untenable conclusion "that Canon 7B(7) does not offend the Oregon Constitution, Article I, section 8, because rules such as Canon 7B(7) were contemplated as a consequence of the adoption by the people of Oregon Constitution Article VII (Amended), section 8." 310 Or at 560. According to the majority:

> "* * * [T]he 1976 amendment to Oregon Constitution, Article VII (Amended), section 8 contained a specific reference to the right of this Court to discipline judges for '[w]ilful violation of any rule of judicial conduct as shall be established by [this Court].' Moreover, there already existed, at the time when that amendment to the constitution was submitted to the people, *former* Canon 7B(2), which contained the same restriction on personal solicitation of campaign funds that is under consideration here. This was, therefore, a situation in which the phrase 'rule of judicial conduct' had a specific meaning that any voter could have looked up, if he or she wished to do so. In referring to 'any rule of judicial conduct,' the proposed constitutional amendment was referring to rules that at the time did, and in the future might restrict to some degree the ability of judges to speak freely. The amendment was adopted by the people."

310 Or at 560.

> "Because the amendment was adopted, there are two potentially conflicting provisions in the constitution — Article I, section 8, and Article VII (Amended), section 8. It is our function to harmonize the two."

310 Or at 560.

> "We have no difficulty in holding that, in this context, it is Article I, section 8 that is modified. When the people, in the face of a pre-existing right to speak, write or print freely on any subject whatever, adopt a constitutional amendment that by its fair import modifies that pre-existing right, the later amendment must be given its due. * * * To hold otherwise would be to deny to later-enacted provisions of the constitution equal dignity as portions of the same fundamental document."

310 Or at 560.

That chain of premises contains serious problems. To understand those problems, an examination of the history of the 1976 amendment to Article VII (Amended), section 8, is helpful.

The original Oregon Code of Judicial Conduct was adopted by this court on March 11, 1975. At that time, the only sanction available for misconduct was removal from office. Oregon Const, *former* Art VII, § 8.[22] The types of misconduct for which removal was authorized were (1) conviction of a felony or other crime involving moral turpitude; (2) wilful misconduct in office involving moral turpitude; (3) wilful or persistent failure to perform judicial duties; and (4) habitual drunkenness or illegal use of narcotic drugs. *Id.*

On April 3, 1975, at the request of the Commission on Judicial Fitness, Senate Joint Resolution 48 (SJR 48) was introduced in the legislature. *See Explanation* to Ballot Measure No. 2, Official Voters' Pamphlet, Oregon Primary Election, May 25, 1976. See "Appendix A." SJR 48 proposed to amend *then* Article VII (Amended), section 8, of the Oregon Constitution, to expand the grounds on which this court could discipline judges to include, *inter alia,* "[w]ilful violation of any rule of judicial conduct as *shall* be established by [this court]" (emphasis added) and to give this court authority to suspend or censure, as well as to remove, an errant judge. *Id.*

SJR 48 was adopted by the Senate on April 30, 1975, and by the House on May 20, 1975. When SJR 48 was under consideration by the Senate and House, the "Senate History Sheet" (see "Appendix B") for the proposed constitutional

---

[22] *See In re Piper,* 271 Or 726, 730-33, 534 P2d 159 (1975) (legislative history of *former* Article VII, section 8, and related statutes discussed).

amendment advised the Senate and House of the purpose of the measure:

"Amending Oregon Constitution, upon voter approval, to give Supreme Court authority to suspend judge from office or to censure judge for incompetent performance, conduct bringing judiciary into disrepute or wilful violation of any rule of judicial conduct and modifies presently stated cause of wilful misconduct in office."

SJR 48 was referred to the electorate as Ballot Measure No. 2 to be voted on in the primary election of May 25, 1976.[23] The voters overwhelmingly approved the measure,[24] thereby creating what is now Article VII (Amended), section 8.[25]

The majority's premise that "there already existed, at the time when that amendment to [Article VII (Amended), section 8, of the Oregon Constitution] was submitted to the people, *former* Canon 7B(2), which contained the *same*

---

[23] Ballot Measure No. 2, at the primary election, May 25, 1976, read:

"DISCIPLINE OF JUDGES

"Purpose: Amends constitutional section providing that Supreme Court may remove a judge from office for certain misconduct, by adding authority of Supreme Court to suspend or censure as well as remove judge. Present grounds for discipline (felony conviction, failure to perform judicial duties, habitual drunkenness, illegal drug use) are expanded to also include wilful misconduct in office related to performance of judicial duties, general incompetence, and wilful violation of any rule of judicial conduct."

Official Voters' Pamphlet, Primary Election, May 25, 1976.

[24] The vote cast on SJR 48, "Measure No. 2": For, 639,977; Against, 59,774.

[25] Article VII (Amended), section 8, of the Oregon Constitution now provides:

"(1) In the manner provided by law, and notwithstanding section 1 of this Article, a judge of any court may be removed or suspended from his judicial office by the Supreme Court, or censured by the Supreme Court, for:

"(a) Conviction in a court of this or any other state, or of the United States, of a crime punishable as a felony or a crime involving moral turpitude; or

"(b) Wilful misconduct in a judicial office where such misconduct bears a demonstrable relationship to the effective performance of judicial duties; or

"(c) Wilful or persistent failure to perform judicial duties; or

"(d) Generally incompetent performance of judicial duties; or

"(e) Wilful violation of any rule of judicial conduct as shall be established by the Supreme Court; or

"(f) Habitual drunkenness or illegal use of narcotic or dangerous drugs.

"(2) Notwithstanding section 6 of this Article, the methods provided in this section, section 1a of this Article and in section 18, Article II of this Constitution, are the exclusive methods of the removal, suspension, or censure of a judge."

restriction on personal solicitation of campaign funds that is under consideration [in this case]" (emphasis added) is overstated. It is true that *former* Canon 7B(2) was part of the 1975 Oregon Code of Judicial Conduct and that it was in effect when the voters adopted the proposed amendment in 1976. The form of the language in *former* Canon 7B(2) was, however, only *hortatory:* "A candidate, including an incumbent judge, for judicial office * * * *should* not himself solicit campaign funds * * *." (Emphasis added.)[26] Present Canon 7B(7), on the other hand, is phrased in *mandatory* language: "A judge may not * * * personally solicit campaign contributions * * *."[27] Thus, the restriction was not the same.

The majority's next premise is that when the proposed amendment to Article VII (Amended), section 8, was before the voters in 1976, the existence at that time of *former* Canon 7B(2) meant that the phrase " 'rule of judicial conduct,' had a specific meaning that any voter could have looked up, if he or she wished to do so" and that such phrase referred "to 'any rule of judicial conduct,' that at the time did, and in the future might restrict to some degree the ability of judges to speak freely." 310 Or at 560. Those statements are surprising. Where would the voters have looked to find the meaning of the *phrase* "rule of judicial conduct"? There is nothing in the record of this case, in the text of the proposed constitutional amendment, or in the Official Voters' Pamphlet that told the voters that "rule of judicial conduct" means what the majority today says it means. In fact, the majority's definition of the phrase "rule of judicial conduct" did not exist until today when it appeared in the majority opinion.

The majority's premise that the amendment's fair

---

[26] The majority states that in *In re Piper*, 271 Or 726, 534 P2d 159 (1975), this court treated the hortatory language in the 1975 Code as mandatory. I disagree. The accused in *Piper* was reprimanded for violating ORS 1.220 and *former* Canon 30 of the Canons of Judicial Ethics. *Former* Canon 30 provided that "judges * * * may not practice law." The court in *Piper* merely noted that *former* Canon 30 had been superseded by Canon 5F of the new Code of Judicial Conduct, which contained hortatory language by providing that a "judge should not practice law." Canon 5F, however, was not adopted until March 11, 1975, which was subsequent to the date that the accused committed those acts for which he was reprimanded. Canon 5F, therefore, was irrelevant to the court's opinion. Moreover, I find no language in *Piper* that suggests that the hortatory language in Canon 5F was or would be treated as mandatory.

[27] *See, supra,* 310 Or at 588-89, for comments concerning the significance of the use of hortatory language as compared with mandatory language.

import "modifies [the] pre-existing [Article I, section 8] right[s]," *see* 310 Or at 560, is, likewise, insupportable.

Article VII (Amended), section 8(1) provides in part:

"In the manner provided by law, and notwithstanding section 1 of this Article, a judge of any court may be removed or suspended from his judicial office by the Supreme Court, or censured by the Supreme Court, for:

"* * * * *

"(e) Wilful violation of any rule of judicial conduct as shall be established by the Supreme Court * * *."

Nothing in the text of section 8(1)(e), in the text of SJR 48 or the referred measure, or in the official explanation of it, or in the "Argument in [Its] Favor,"[28] all of which appeared in the Official Voters' Pamphlet (reproduced as "Appendix A"), suggested that the proposed constitutional amendment, if adopted, would either modify pre-existing free speech rights or give this court the far-reaching power to enact rules of judicial conduct that would infringe on these rights.

Indeed, if the purpose of the proposed constitutional amendment was to give "rules of judicial conduct as *shall* be established by [this court]" (emphasis added) *constitutional dimension,* as the majority today holds, then surely that purpose would have been disclosed in the ballot title. It was not. When Measure No. 2 was submitted to the voters, Oregon law required that "the ballot title [prepared either by the Legislative Assembly or the Attorney General] shall consist of a caption not exceeding six words in length by which the measure is commonly referred to or spoken of, followed by an abbreviated *statement* not exceeding 75 words in length *of the chief purpose of the measure" and so prepared "shall be a concise and impartial statement of the purpose of the measure."* (Emphasis added.) *Former* ORS 254.070 (1975) (*repealed by* Or Laws 1979, Ch 190, § 431) (relating to ballot title prepared by the Attorney General); ORS 254.073 (1975) (renumbered ORS 250.075) (relating to ballot title prepared by the Legislative Assembly).

The ballot title for Measure No. 2, as noted, was prepared by the Legislative Assembly. It is doubtful that the

---

[28] There were no arguments against the measure in the Voters' Pamphlet.

Legislative Assembly would have referred that measure had it known that the measure would be interpreted as broadly as has the majority. Moreover, if we presume, as we should, that "the law has been obeyed," *see former* ORS 41.360(33) (*repealed by* Or Laws 1981, Ch 892, § 98) (*present* OEC 311(1)(x)), and that the "official duty had been regularly performed," *see former* ORS 41.360(15) (*repealed by* Or Laws 1981, Ch 892, § 98) (present OEC 311(1)(i)), we reasonably can conclude from the contents of the ballot title for Measure No. 2 that the measure's purpose was not either to "constitutionalize" rules of judicial conduct promulgated by this court or to give this court the extraordinary power to enforce rules of judicial conduct that otherwise infringe upon rights guaranteed by Oregon constitutional provisions, as the majority today holds.

The Oregon Constitution, Article IV, section 1, gives the legislature (and reserves to the people themselves) plenary lawmaking power; yet this power remains subject to constitutional guarantees, such as Oregon Bill of Rights. So, too, is the judicial branch subject to Oregon's Bill of Rights. I cannot accept the majority's premise that because *former* Canon 7B(2) was in effect when Article VII (Amended), section 8, was amended in 1976, the rights guaranteed by Article I, section 8, must yield to any conflicting rule of judicial conduct adopted by this court. A rule of judicial conduct is not exempted from complying with Oregon constitutional guarantees merely because it existed when the proposed amendment to Article VII (Amended), section 8, was adopted in 1976.

The majority also ignores our proper role in interpreting an amendment to our constitution. It has gone beyond the face of the enacted language of the 1976 amendment to Article VII (Amended), section 8. In *Northwest Natural Gas Company v. Frank,* 293 Or 374, 381, 648 P2d 1284 (1982), we said:

> "As a court, our role is to interpret the statutes and constitutional provisions. We do not redraft these provisions; we interpret them as the legislature has drafted them. It is axiomatic that in a case of statutory and constitutional construction, this court must give preeminent attention to the language which the legislature and the people have adopted.
> * * *
> *"The requirement that we give effect to the words of an*

*enactment is doubly applicable when the law in question is a constitutional amendment adopted by the voters. * * * Given the fact that it is the electorate, the ultimate sovereign, which has adopted the amendment to our Constitution, we are slow to go beyond the face of the enacted language * * *."* (Emphasis added.)

In *State ex rel Oregonian Pub. Co. v. Deiz,* 289 Or 277, 284, 613 P2d 23 (1980), in answer to an argument that contemporaneous laws for closing courts co-exist with Article I, section 10, of the Oregon Constitution,[29] this court said:

"Contemporaneous legislative actions should not necessarily be given much weight when construing constitutional principles. Constitutional draftsmen are concerned with broad principles of long-range significance; legislators are more likely to be concerned with the immediate. We have observed a political temptation to adopt an ideal as an abstract principle and then substantially undercut the ideal in order to accommodate an immediate concern."

*See also State v. Henry, supra,* 302 Or at 521 (same principle applied in determining scope of free "speech" protection afforded by Article I, section 8, of the Oregon Constitution). So it is with Article I, section 8, and Canon 7B(7), assuming that rule otherwise violates Article I, section 8.

Today, the majority ignores that principle. It thereby elevates itself above the other branches of government by giving itself the authority to legislate rules of judicial conduct, enforceable by removal or suspension from judicial office or public censure, that otherwise violate Article I, section 8, or other Oregon constitutional provisions.

The effect of the majority's holding is that this court could adopt and enforce rules of judicial conduct, violative of Oregon's Bill of Rights.[30] It could, for example, (a) bar a state

---

[29] Article I, section 10, of the Oregon Constitution provides:

"No court shall be secret, but justice shall be administered, openly * * *."

[30] This court ignores the principle it recognized in *Lloyd Corporation v. Whiffen, supra,* 307 Or at 680, that a court must observe constitutional principles as much as the other branches of government.

As this court stated in *State v. Clark,* 291 Or 231, 235 n 5, 630 P2d 810 (1981):

"The fact that a procedure, a power, or a program is itself stated in the constitution, * * * does not relieve them from compliance with other constitutional standards unless these are expressly excluded. There are many such provisions placed in the Oregon Constitution (e.g. sale of alcoholic liquor, Art I, § 39, educational funding, art VIII, §§ 2-5, and the bonding authorities of Article XI-A through H) that are not thereby placed beyond the guarantees in Article I, the Bill of Rights."

judge, who must run for re-election every six years,[31] or a candidate for a state elective judicial office, from asking individual voters to support his or her election, (b) bar an individual seeking to be elected to a state judicial office from asking an individual to serve on his or her committee, (c) restrict the ability of judges to speak at any time, in any place, on any subject whatever; (d) require judges to open court session with a prayer, or, conversely, prohibit judges from praying for divine guidance before making a difficult decision. If this court has the extraordinary power it now claims, why did it in *In re Lasswell, supra,* 296 Or at 121, and *In re Richmond, supra,* test the disciplinary rules at issue against Article I, section 8?

Another effect of the majority's holding is that a rule that would be unconstitutional in substance, but for the 1976 amendment, is constitutional because it existed before 1976, even though it was unconstitutional then. If, as the majority holds, Article VII (Amended), section 8(1)(e), made constitutional rules that had been unconstitutional, there should be a substantial showing that the Legislative Assembly, who referred SJR 48 to the voters, and the Oregon voters, intended that result. No such showing has been made in this case. The text of Article VII (Amended), section 8(1)(e) points in the opposite direction; it is in the *future* tense. Section 8(1)(e) speaks of such rules "as *shall* be established by [this court]." (Emphasis added.)

In sum, this court does not, in my view, have the power to intrude upon the constitutional rights and guarantees of judges or judicial candidates through rules of professional conduct. Canon 7B(7) is not itself, as the majority holds, of constitutional dimension. Rather, the constitutionality of Canon 7B(7) must be tested in the context of a particular case against the Oregon Bill of Rights. Canon 7B(7)'s ban, *as applied* to the conduct for which the Accused is charged, in my opinion, violates Article I, section 8, of the Oregon Constitution. I would, therefore, dismiss the complaint brought by the Commission against the Accused.

---

[31] *See* Or Const, Art VII (Amended), § 1.

## III.
## FIRST AND FOURTEENTH AMENDMENT CLAIMS

The First Amendment to the United States Constitution, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, forbids a state to make a law "abridging the freedom of speech * * * or the right of the people peaceably to assemble[.]" The Accused claims that Canon 7B(7) violates the First and Fourteenth Amendments "by abridging a judicial candidate's freedom," because it "tells a candidate that he or she may not speak or write to others requesting campaign contributions." The Accused also claims that "Canon 7B(7) * * * violates the right of assembly by limiting the public's interaction with a political candidate." The majority rejects those claims. I do not agree with the majority. I believe that because the government has failed to show that the ban on mere personal requests for campaign funds by a judicial candidate serves a compelling state interest, I would hold that Canon 7B(7), as applied in this case, violates the Accused's right to free speech and free association provided by the First and Fourteenth Amendments.

The broad authority of this court to promulgate rules of judicial conduct does not extinguish its responsibility to observe the limits established by the First and Fourteenth Amendments' rights of the state's citizens. *Eu v. San Francisco County Democratic Central Committee,* 489 US 214, 221-22, 109 S Ct 1013, 1019-20, 103 L Ed 2d 271, 281 (1989).[32]

To assess the constitutionality of Canon 7B(7) under the First and Fourteenth Amendments, we first examine whether it burdens rights protected by the First and Fourteenth Amendments. *See id.; Tashjian v. Republican Party of Connecticut,* 479 US 208, 214, 107 S Ct 544, 93 L Ed 2d 514, 523 (1986) (quoting *Anderson v. Celebrezze,* 460 US 780, 789, 103 S Ct 1564, 75 L Ed 2d 547 (1983)); *Geary v. Renne,* 911 F2d

---

[32] The First Amendment has been construed to protect free speech rights from intrusion by any branch of the government, including the executive and judiciary, at both the federal and state levels. *See New York Times Co. v. United States,* 403 US 713, 718-19, 91 S Ct 2140, 29 L Ed 2d 822 (1971) (Black, J., concurring) (First Amendment barred executive branch from obtaining and judicial branch from granting injunction to prevent publication of defense secrets). *See also ACLU of Fla. Inc. and John Roe v. The Florida Bar and the Florida Judicial Qualifications Commission,* 744 F Supp 1094 (ND Fla 1990) (provision of Florida's Code of Judicial conduct held to violate First Amendment free speech rights[.]).

280, 282 (9th Cir 1990). If the challenged canon burdens First and Fourteenth Amendment rights, it can survive constitutional scrutiny only if the state shows that it advances a compelling state interest, *see Eu v. San Francisco County Democratic Central Committee, supra; First National Bank of Boston v. Bellotti,* 435 US 765, 786, 98 S Ct 1407, 55 L Ed 2d 707 (1977); *Geary v. Renne, supra,* 911 F2d at 283, and is "narrowly tailored to serve that interest." *Eu v. San Francisco County Democratic Central Committee, supra; First National Bank of Boston v. Bellotti, supra,* 435 US at 786; *Geary v. Renne, supra.*

It is beyond debate that "[s]olicitation [of campaign funds] is a recognized form of speech protected by the First [and Fourteenth] Amendment[s]." *United States v. Kokinda,* 497 US ___, ___, 110 S Ct 3115, 3118, 111 L Ed 2d 571, 580 (1990). It is also beyond dispute that Canon 7B(7) directly affects political speech (which includes the freedom to publicize political views), the inviolability of which rests "at the core of our electoral process and of First Amendment freedoms." *Eu v. San Francisco County Democratic Central Committee, supra,* 103 L Ed 2d at 282 (quoting *Williams v. Rhodes,* 393 US 23, 32, 89 S Ct 5, 21 L Ed 24 (1968)). *See also Buckley v. Valeo,* 424 US 1, 14, 96 S Ct 612, 632, 46 L Ed 2d 659 (1976) ("[t]he First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for bringing about political and social changes desired by the people.' "); *Monitor Patriot Co. v. Roy,* 401 US 265, 271-72, 91 S Ct 621, 625, 28 L Ed 2d 35 (1971) ("[t]he First Amendment was 'fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people' " and "it can hardly be doubted that [its] constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office"); *Geary v. Renne, supra* (California's ban on political party endorsements for candidates for judicial and other nonpartisan offices held violative of the First and Fourteenth Amendments.)

Barring judicial candidates from personally soliciting campaign funds not only burdens their freedom of speech but also infringes on their freedom of association protected by the First and Fourteenth Amendments, *see Buckley v. Valeo, supra,* 424 US at 22, 25, and the individual voter's right to

associate with the judicial candidate of his or her choice. *See Eu v. San Francisco County Democratic Central Committee, supra,* 103 L Ed 2d at 283 ("[f]reedom of association means * * * that an individual voter has the right to associate with the [candidate] of her choice"; *Tashjian v. Republican Party of Connecticut, supra,* 479 US at 214 ("freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.") In *Buckley v. Valeo, supra,* the court observed that the First Amendment "protects political association as well as political expression." 424 US at 15. It concluded that making a political contribution "affiliate[s] a person with a candidate" and that expending resources on behalf of a candidate enables associations to "effectively [amplify] the voice of their adherents." *Id.* at 22.

Because Canon 7B(7)'s ban burdens free speech and free association, it only can survive if it serves a compelling state interest and is narrowly tailored to serve that interest. *See Eu v. San Francisco County Democratic Central Committee, supra,* 103 L Ed 2d at 281; *First National Bank of Boston v. Bellotti, supra,* 435 US at 786. The burden is on the government to show (1) that there is a *compelling* state interest, (2) that the canon *serves* that interest, and (3) that the canon is narrowly tailored to serve that interest. On this record, Canon 7B(7) fails the second part of the test.[33]

The majority opinion offers two compelling state interests: "maintaining the integrity of the judiciary and the appearance of that integrity." Maintaining the integrity of the judiciary is unquestionably a compelling state interest. I will assume, *arguendo,* that the state's interest in maintaining the "appearance of [judicial] integrity"[34] is likewise a compelling state interest. The state, in this case, does not *adequately* explain how prohibiting a judicial candidate's personal

---

[33] *See ACLU of Fla., Inc. and John Roe v. The Florida Bar and the Florida Judicial Qualifications Commission, supra* (provision of Florida's Code of Judicial Conduct prohibiting judicial candidates from discussing "disputed legal and political issues" during their campaign for an elective judgeship held violative of the First Amendment because the defendant did not demonstrate that the provision "is the least restrictive means for protecting a compelling state interest.") 744 F Supp at 1099.

[34] See discussion of "appearance of impropriety," *supra,* 310 Or at 588, in this dissenting opinion.

request for campaign funds, by itself (unaccompanied by any impropriety), maintains the integrity of the judiciary or the appearance of that integrity. As discussed above, there is nothing in the record (other than surmise) that shows that the integrity of the judiciary or the appearance of that integrity is any more advanced now than it was in 1983, when this court promulgated Canons 7B(7) and 7D, or in 1975, when this court included *former* Canon 7B(2), cast in hortatory language, in the original Oregon Code of Judicial Conduct. The state has not shown, as it must, that Canon 7B(7)'s ban is necessary to the integrity or the appearance of the integrity of the judiciary.

In *Eu v. San Francisco County Democratic Central Committee, supra,* a unanimous Court invalidated provisions of the California Election Code that prohibited, *inter alia,* official governing bodies of political parties from endorsing candidates in party primaries. The Court said that if "the challenged law burdens the rights of political parties and their members, it can survive constitutional scrutiny only if the State shows that it advances a compelling state interest, * * * and is narrowly tailored to serve that interest." 103 L Ed 2d at 281. The California law did burden associational rights of the parties and their members. *Id.* at 282-83. The prohibition against endorsements "directly hampers the ability of a party to spread its message and hamstrings voters seeking to inform themselves about the candidates and the campaign issues." *Id.* at 282. The Court rejected the state's contention that the prohibition serves the compelling state interests of "stable government and protecting voters from confusion and undue influence."

> "Maintaining a stable political system is * * * a compelling state interest. * * * California, however, never adequately explains how banning parties from endorsing or opposing primary candidates advances that interest. There is no showing, for example, that California's political system is any more stable now than it was in 1963, when the legislature enacted the ban."

*Id.* at 284. The Court also rejected the state's contention that the prohibition is necessary to protect primary voters from confusion and undue influence.

> "Certainly the State has a legitimate interest in fostering an informed electorate. * * * While a State may regulate the flow

of information between political associations and their members when necessary to prevent fraud and corruption, * * * *there is no evidence that California's ban on party primary endorsements serves that purpose."* (Emphasis added.)

*Id.* at 285-86. The Court concluded: "Because the ban on primary endorsements by political parties burdens political speech while serving no compelling governments interests, we hold that [the prohibition] violate[s] the First and Fourteenth Amendment[s]." *Id.* at 286.

In *Geary v. Renne, supra,* the United States Court of Appeals for the Ninth Circuit relied upon *Eu,* holding that *Eu*'s rationale was not limited to partisan elections. In *Geary,* the court ruled that California's ban on political party endorsements of candidates for judicial and other nonpartisan offices violates the First and Fourteenth Amendments. The court, speaking through Chief Judge Goodwin, held "that the restrictions * * * implicate * * * [F]irst [A]mendment rights" because the ban "directly affects political speech." *Id.* at 283. The state contended that the prohibition is essential to preserving the nonpartisan nature of its local and judicial elections, and that its interest "in preventing the appearance or reality of 'corruption' of nonpartisan officeholders" is compelling enough to sustain the ban. *Id.* at 284. The court disagreed. The court said that the corruption of the political process that is subject to regulation involves the prospect of financial gain to candidates themselves or the infusion of money into their campaigns. But "(t)he fact that candidates * * * may alter or reaffirm their own positions on issues in response to political messages [is] hardly * * * corruption, for one of the essential features of democracy is the presentation to the electorate of varying points of view." *Id.* at 284 (quoting *FEC v. Nat'l Conservative Political Action Comm.,* 470 US 480, 498, 105 S Ct 1459, 1468, 84 L Ed 2d 455 (1985)). Suggesting less intrusive alternatives, the court also found that the prohibition at issue was not narrowly tailored to achieve its ends. *Id.* "[T]he state's power to protect the integrity of its electoral processes 'does not justify, without more, the abridgement of fundamental rights, such as the right to vote, * * * or, as here, the freedom of political association.' " *Id.* at 286.

The majority opinion in the present case mistakenly relies on *Ohralik v. Ohio State Bar Association,* 436 US 447, 98

S Ct 1912, 56 L Ed 2d 444 (1978), and misreads *In re Primus,* 436 US 412, 98 S Ct 1893, 56 L Ed 2d 417 (1978), to reach the conclusion that Canon 7B(7) does not violate the Accused's First and Fourteenth Amendment rights. The majority's analysis of *Ohralik* and *Primus* fails to recognize the different positions that "commercial speech" and "political speech" have on the scale of First Amendment values. Political speech is subject to First Amendment strict scrutiny, whereas commercial speech[35] is subject to a lower level of scrutiny. Under First Amendment jurisprudence, therefore, governments can regulate commercial speech to a greater degree and for different purposes than political speech.[36]

In *Ohralik* and *Primus,* the court considered the problems associated with in-person solicitation of clients by attorneys. In *Ohralik,* the court upheld a disciplinary action against an attorney who violated the state's canon of ethics by soliciting clients in person, for pecuniary gain, under circumstances likely to pose dangers that the state has a right to prevent. The lawyer in *Ohralik* solicited the victim of an automobile accident in a hospital where she lay in traction. He sought out another potential client on the day she came home from the hospital. He urged both to employ him and used a concealed tape recorder to assure evidence of the assent to representation. He refused to withdraw when asked to do so. The Supreme Court reasoned that solicitation for private gain (commercial speech) under the circumstances of *Ohralik* could be proscribed *without showing harm in a given case* because the circumstances were likely to result in misleading, deceptive, and overbearing conduct. 436 US at 462-67.

---

[35] Commercial speech, as defined by the Court, is speech which does no more than propose a commercial transaction, *Board of Trustees of State University of New York v. Fox,* ___ US ___, ___, 109 S Ct 3028, 3036, 106 L Ed 2d 388 (1989); *Bolger v. Youngs Drug Products Corp.,* 463 US 60, 66, 103 S Ct 2875, 77 L Ed 2d 469 (1983); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 US 748, 762, 96 S Ct 1817, 48 L Ed 2d 346 (1976). Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. v. Public Serv. Comm'n,* 447 US 557, 561, 100 S Ct 2343, 65 L Ed 2d 341 (1980).

[36] *See City of Hillsboro v. Purcell,* 306 Or 547, 553, 761 P2d 510 (1988), where we said:

"The United States Supreme Court * * * has held, though not with uniformity of rationale, that governments can regulate [commercial speech] to a greater degree and for different purposes than other protected speech." (Numerous cases cited, including *Ohralik,* omitted.)

In *In re Primus, supra,* the United States Supreme Court concluded that the state could not constitutionally discipline a lawyer (assisting the American Civil Liberties Union). The lawyer had advised a prospective client, who had been sterilized as a condition of the continued receipt of medical assistance under the Medicaid program, that a lawsuit might be appropriate. The lawyer also wrote a letter to the prospective client offering free representation through the ACLU. The Court concluded that the state's interest in prohibiting the evils of solicitation did not justify the ban on Primus' activities. 436 US at 434-38. The Court held that Primus' solicitation on behalf of a nonprofit organization, which litigated as a form of political speech and association, could *be regulated only where actual harm is shown in the particular case:* "Where political expression or association is at issue," a member of the bar "may not be disciplined unless her activity in fact involve[s] the type of misconduct" at which antisolicitation rules are directed. *Id.* at 434.

In both *Primus* and *Ohralik,* the Court made clear the distinction between commercial speech and political speech. In *Primus* the Court said:

> "Where political expression or association is at issue, this Court has not tolerated the degree of imprecision that often characterizes government regulation of the conduct of commercial affairs. The approach we adopt[ed] * * * in *Ohralik,* * * * that the state may proscribe in-person solicitation for pecuniary gain under circumstances likely to result in adverse consequences, cannot be applied to [Primus'] activity ['political expression and association'] on behalf of the ACLU. Although a showing of potential danger may suffice in the * * * context [of commercial speech], [Primus] may not be disciplined unless her activity in fact involved the type of misconduct at which [the state's] broad prohibition is said to be directed."

*Id.*[37] In *Ohralik,* the Court stated that the federal constitution affords "commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment value[s]." *Ohralik, supra,* 436 US at 456. *See* Tribe, American Constitutional Law 896 (2d ed 1988).

---

[37] *See* Note, *In-Person Solicitation by Public Interest Law Firms: A Look at the A.B.A. Code Provisions In Light of Primus and Ohralik,* 49 Geo Wash L Rev 309 (1981).

*Ohralik* is, therefore, clearly inapposite, because here political speech is involved. The analogy between *Primus* and the present case, however, is plain: each involves an allegation of violation of a code of professional conduct; each involves political speech and association; each involves an attempt by the state to regulate that protected activity; each involves a claim of conflict between a code of professional conduct and the First and Fourteenth Amendments; and neither involves a showing by the state of *actual* harm from the Accused's activity.

In sum, in my view, the state has failed to show that Canon 7B(7)'s ban, as *applied* to the conduct for which the Accused is charged in this proceeding, serves a compelling state interest. I would hold that the *application* of Canon 7B(7)'s ban to the facts of this case violates the Accused's First and Fourteenth Amendment rights to free speech and free association. I would, therefore, dismiss the complaint that the Commission has brought against the Accused.

As to the majority's constitutional analyses, I respectfully dissent.

Van Hoomissen, J., joins in this opinion.

## "APPENDIX A"

Official Voters' Pamphlet, Oregon Primary Election, May 25, 1976, pages 7-8, provided the following information to Oregon voters:

### Measure No. 2
### Discipline of Judges

Referred to Electorate of Oregon by the 1975 Legislature to be voted on at the Primary Election, May 25, 1976.

### Explanation
### By Committee Designated Pursuant to ORS 254.210

In 1968 the people of Oregon added Section 8 to Article VII of the Oregon Constitution (Judicial Department). The added section provided the exclusive methods for removing from office (other than recall by the voters) a judge of any Oregon court and established as grounds for removal (1) conviction of a felony or other crime involving moral turpitude; (2) willful misconduct in office involving moral turpitude; (3) willful or persistent failure to perform judicial duties; and (4) habitual drunkenness or illegal use of narcotic drugs.

Adoption of this section permitted the establishment of the Commission on Judicial Fitness consisting of three judges appointed by the Supreme Court, three attorneys appointed by the Board of Governors of the Oregon State Bar, and three persons who are neither attorneys nor judges, appointed by the Governor. Complaints may be filed against judges with the Commission. The complaints are reviewed and investigated and hearings are held on those which fall within the grounds for removal. If the Commission finds that the conduct of a judge justifies removal from judicial office, the Commission shall so recommend to the Supreme Court. The Supreme Court then reviews the case, and it may remove the judge from office or dismiss the charge.

Experience since 1968 has shown a need for additional and more realistic grounds and methods for the discipline of judges. The present law is too vague and restrictive and this has hampered the Commission and the Supreme Court in dealing with some misconduct which warrants discipline short of removal from office.

The Act before the voters as Ballot Measure No. 2 clarifies and corrects the deficiencies. It strengthens the present law, brings more types of judicial misconduct within the authority of the Commission and the Supreme Court and provides more flexibility and alternatives in disciplining errant judges.

Specifically the measure gives to the Supreme Court authority to censure and to temporarily suspend a judge as well as to remove a judge from office. The present grounds for discipline are expanded to include (1) conviction of a felony or other crime involving moral turpitude; (2) willful misconduct in office related to effective performance of judicial duties; (3) willful or persistent failure to perform judicial duties; (4) general incompetence in office; (5) willful violation of any Supreme Court rule of judicial conduct; and (6) habitual drunkenness or illegal or habitual use of narcotic or dangerous drugs.

Ballot Measure No. 2 was introduced in the Legislature at the request of the Commission on Judicial Fitness. During the Legislature's consideration of the measure, no one testified against it, and only two Senators and one Representative voted against it. The measure is supported by the Supreme Court and by the Oregon Judicial Conference which is made up of all District, Circuit, Tax and Appellate Court judges in Oregon.

| Committee Members | Appointed By |
| --- | --- |
| Senator Elizabeth Browne | President of the Senate |
| Representative Ted Kulongoski | Speaker of the House |
| Stamm F. Johnson, Attorney | Secretary of State |
| Representative Al Densmore | Secretary of State |
| Senator Wallace P. Carson Jr. | Members of Committee |

## Measure No. 2
### Discipline of Judges
### Argument in Favor
### By Joint Legislative Committee
### Designated Pursuant to ORS 255.465

Should a judge be above the law? Or should he be subject to a discipline for abuses of his judicial office? Ballot Measure #2 should be voted "YES" so the Supreme Court will have broader powers to discipline judges and greater flexibility in the kind of discipline to be applied.

Unless this measure passes, the Supreme Court will not have the power to suspend a judge nor to publicly censure for judicial misconduct. And the Supreme Court will not have the power to correct potential misconduct of a judge, concerning his official duties, if the misconduct does not amount to a crime or to heinous dishonesty.

At present, only the most serious types of judicial misconduct may be reached by the Supreme Court in the disciplining of judges. Cases of lesser misconduct go unquestioned.

And, at present, the only discipline available to the Supreme Court in a case involving an Oregon judge is removal from office.

Removal from office is seldom, if ever, used. This means cases of acknowledged judicial misconduct go completely unremedied because the Supreme Court may feel removal from office is too harsh.

The citizens of the state should benefit from the greater flexibility and broader range of coverage provided by this measure.

Temporary suspension from office or public censure should be available to the Supreme Court, and a judge who is generally incompetent in the performance of his duties, or who engages in wilful violation of a rule of judicial conduct should be the subject of discipline. For example, appropriate discipline should be available where a judge sits in judgment on his own individual rights to bail or on his or her other personal rights. Judges are only human. Sometimes they fail to decide a case until months after it has been tried. Sometimes they berate the private citizen who must rely on the courts for protection.

The enlarged power to discipline a judge, which is contained in this proposed change in our constitution, can only be exercised by the Supreme Court. So, the independence of the Judiciary is maintained. And, there is no lessening of the independent power of recall reserved to the people in other sections of our Oregon constitution.

For these reasons, we join with Oregon's Commission on Judicial Fitness, which requested that this measure be placed on the ballot, and urge Oregonians to vote "YES" on Measure #2 for broader, more flexible power to discipline judges. People have the right to respectful, courteous and fair treatment by all levels of government, including the judiciary. A "YES" vote on Measure #2 will help the people get the best from their judges.

| Joint Legislative Committee | Appointed By |
|---|---|
| Representative Dick Magruder | Speaker of the House |
| Representative Hardy Myers | Speaker of the House |
| Senator Ed Fadeley | President of the Senate |

## Discipline of Judges
### Be It Resolved by the Legislative Assembly
### of the State of Oregon:

Paragraph 1. Section 8, Article VII (Amended) of the Constitution of the State of Oregon, is amended to read:

Sec. 8. (1) In the manner provided by law, and notwithstanding section 1 of this Article, a judge of any court may be removed **or suspended** from his judicial office by the Supreme Court, **or censured by the Supreme Court,** for:

(a) Conviction in a court of this or any other state, or of the United States, of a crime punishable as a felony or a crime involving moral turpitude; or

(b) Wilful misconduct in a judicial office [involving moral turpitude] **where such misconduct bears a demonstrable relationship to the effective performance of judicial duties**; or

(c) Wilful or persistent failure to perform judicial duties; **or**

(d) **Generally incompetent performance of judicial duties; or**

(e) **Wilful violation of any rule of judicial conduct as shall be established by the Supreme Court; or**

[(d)] **(f)** Habitual drunkenness or illegal use of narcotic **or dangerous** drugs.

(2) Notwithstanding section 6 of this Article, the methods provided in this section, **section 1a of this Article** and in section 18, Article II of this Constitution, are the exclusive methods of **the** removal**, suspension, or censure** of a judge [from judicial office].

Paragraph 2. The amendment proposed by this resolution shall be submitted to the people for their approval or rejection at the special election to be held on the same date as the state-wide primary election in 1976.

## BALLOT TITLE
**DISCIPLINE OF JUDGES**

Purpose: Amends constitutional section providing that Supreme Court may remove a judge from office for certain misconduct, by adding authority of Supreme Court to suspend or censure as well as remove judge. Present grounds for discipline (felony conviction, failure to perform judicial duties, habitual drunkenness, illegal drug use) are expanded to also include wilful misconduct in office related to performance of judicial duties, general incompetence, and wilful violation of any rule of judicial conduct.

YES ☐
NO ☐

# "APPENDIX B"

**SENATE**

| | ~~XXHX~~ | | |
|---|---|---|---|
| | JOINT **Resolution** | 48 | |
| | ~~XXXXXXX~~ | | |

DATE A—ENGROSSED .. _April 24_
DATE ~~B~~ ENGROSSED .. _May 15_
DATE C—ENGROSSED ...
DATE D—ENGROSSED ..
DATE E—ENGROSSED
DATE ENROLLED _May 23_

COMMITTEE ON JUDICIARY (at the request of Oregon Commission on Judicial Fitness)

Amending Oregon Constitution, upon voter approval, to give Supreme Court authority to suspend judge from office or to censure judge for incompetent performance, conduct bringing judiciary into disrepute or wilful violation of any rule of judicial conduct _and modify presently stated cause of wilful misconduct in office._

| SENATE ACTION | HOUSE ACTION |
|---|---|
| **IRST TIME** 3 1975 **READ SECOND TIME** APR - 4 1975 | **READ FIRST** MAY 1975 **READ SECOND TIME** |
| **ED TO** Judiciary | **REFERRED TO** JUDICIARY |
| **ED BACK** 2 5 1975 **WITH THE RECOMMENDATION THAT IT** ▼ BAA | **REPORTED BACK** MAY 1 5 1975 **WITH THE RECOMMENDATION THAT IT** ▼ adopt w/ amd's To A-eng Bill print engrossed |
| **RRED TO** | **REREFERRED TO** |
| **TED BACK** **WITH THE RECOMMENDATION THAT IT** ▼ | **REPORTED BACK** **WITH THE RECOMMENDATION THAT IT** ▼ |
| **HIRD TIME AND ASSED** APR 3 0 1975 _of the_ Cecie S. Edwards SECRETARY OF SENATE | Second **READ THIRD TIME AND PASSED** ADOPTED MAY 2 0 1975 **SIGNED** CHIEF CLERK |
| 1975 Cecie L. Edwards | MAY 2 3 1975 **SENATE CONCURRED IN HOUSE AMENDMENTS AND REPASSED** |

**ADDITIONAL ACTION**

| DATE | ACTION |
|---|---|
| 1 9 1975 [RS] | CARRIED OVER TO HEAD OF TOMORROW'S THIRD READING CALENDAR. |
| | |
| | |
| | |
| | |
| | |
| | |

IC (75)